No. 26-1192

# United States Court of Appeals for the Seventh Circuit

UNITED STATES OF AMERICA,
*Plaintiff-Appellee*,

*v.*

JESSE L. GRAVES
*Defendant-Appellant*.

Appeal from the United States District Court
for the Northern District of Indiana
Case No. 1:24-cr-49
The Honorable Holly A. Brady, Chief Judge

## DEFENDANT-APPELLANT JESSE L. GRAVES'S OPENING BRIEF AND REQUIRED SHORT APPENDIX

NORTHERN DISTRICT OF INDIANA
FEDERAL COMMUNITY DEFENDERS, INC.

2929 Carlson Drive, Suite 101
Hammond, Indiana 46323
Telephone: (219) 937-8020
Fax: (219) 937-8021
Email: jared_hamernick@fd.org

JARED E. HAMERNICK
Assistant Federal Defender

Attorney for Defendant-Appellant
JESSE L. GRAVES

Oral Argument Requested

**Appearance & Circuit Rule 26.1 Disclosure Statement**

Appeal No. 26-1192

United States v. Jesse L. Graves

(1) The undersigned attorney represents the sole appellant, Jesse L. Graves, a natural person, in this appeal.

(2) Jared Hamernick, Assistant Federal Defender, Northern District of Indiana, Federal Community Defenders, Inc., is the only attorney expected to appear for Mr. Graves in this appeal.

Mr. Graves was previously by:

Michelle F. Kraus, Northern District of Indiana Federal Community Defenders, Inc. 200 E. Main Street, Suite 905, Fort Wayne, IN 46802

(3) N/a

(4) N/a

(5) N/a

Date: June 29, 2026

Northern District of Indiana
Federal Community Defenders, Inc.

By: s/*Jared Hamernick*
Jared Hamernick
*Counsel of Record*

2929 Carlson Drive, Suite 101
Hammond, IN 46323
Telephone: (219) 937-8020
Fax: (219) 937-8021
Email: Jared_Hamernick@fd.org

## Table of Contents

**Page**

Appearance and Circuit Rule 26.1 Disclosure Statement .............................. i

Table of Contents .............................. ii

Table of Authorities .............................. iv

Introduction .............................. 1

Jurisdictional Statement .............................. 3

Statement of the Issues .............................. 4

Statement of the Case .............................. 5

**I.** Indiana's evolving standards for domestic battery and the degree of bodily injury required for a conviction. .............................. 5

**II.** Jesse Graves possesses a gun after being convicted of misdemeanor and felony domestic battery under the 2012 version of Indiana's domestic battery statute. .............................. 8

**III.** Mr. Graves receives concurrent 60-month sentences for possessing a gun in a way that violated two provisions of 18 U.S.C. § 922(g). .............................. 9

**A.** Mr. Graves pleads guilty to violating 18 U.S.C. § 922(g)(1) and § 922(g)(9) by possessing a firearm on November 27, 2024. .............................. 10

**B.** Mr. Graves argues that his prior felony conviction for domestic battery is not crime of violence given how expansively *Bailey v. State* interpreted "bodily injury." .............................. 11

**C.** The court concludes that Mr. Graves's 2012 conviction is a crime of violence without addressing *Bailey v. State*. .............................. 12

**D.** At sentencing, the court imposes concurrent 60-month sentences on both of Mr. Graves's convictions. .............................. 13

Summary of the Argument ..................................................................... 15

Argument ............................................................................................... 16

**I.** Indiana's valid policy choice to construe "bodily injury" extremely broadly leads to the side effect that Indiana's 2012 version of domestic battery is not a crime of violence. .................... 17

**A.** This Court uses the categorical approach to determine whether a prior conviction is a crime of violence under the Sentencing Guidelines. ....................................................... 17

**B.** The Supreme Court has explained that crimes of violence under federal law require physical force that could cause injury to another. ..................................................................... 19

**C.** Indiana's law of domestic battery requires "bodily injury," but Indiana's courts have construed that phrase to include "any impairment," including illness, no matter how slight. ............................................................................ 21

**D.** Indiana's bodily injury requirement is not a categorical match for "physical force" under U.S.S.G. § 4B1.2(a). ........... 23

**E.** This Court's decision in *United States v. Love* does not require a different result. ......................................................... 26

**F.** The district court's error was not harmless because it did not explain why a five-level decrease to Mr. Graves's offense level was irrelevant to the court's sentencing decision. ................................................................................ 27

**II.** Mr. Graves's dual convictions under 18 U.S.C. § 922(g)(1) and § (g)(9) for the same conduct are plainly erroneous. ......................... 28

Conclusion ............................................................................................ 31

Certificate of Compliance ................................................................... 32

Certificate of Service ........................................................................... 33

## Table of Authorities

**Cases** **Page**

*Alexander v. Scheid*,
726 N.E.2d 272 (Ind. 2000) ........ 25

*Bailey v. State*,
No. 49A02-1106-CR-487, 2012 WL 350735 (Ind. Ct. App. 2012) ........ 6

*Bailey v. State*,
979 N.E.2d 133 (Ind. 2012) ........ *passim*

*Ball v. United States*,
470 U.S. 856 (1985) ........ 30

*Bridges v. United States*,
991 F.3d 793 (7th Cir. 2021) ........ 18

*Delligatti v. United States*,
604 U.S. 423 (2025) ........ 19, 20, 23

*Descamps v. United States*,
570 U.S. 254 (2013) ........ 18, 22

*Fleming v. State*,
833 N.E.2d 84 (Ind. Ct. App. 2005) ........ 22

*Flores v. Ashcroft*,
350 F.3d 666 (7th Cir. 2003) ........ 19, 20

*Hall v. State*,
493 N.E.2d 433 (Ind. 1986) ........ 25

*Hanic v. State*,
406 N.E.2d 335 (Ind. Ct. App. 1980) ........ 23, 24

*Hardiman v. State*,
No. 18A-CR-317, 2018 WL 5020712 (Ind. Ct. App. 2018) ........ 25

*Ind. Dep't of Revenue v. Kitchin Hosp., LLC*,
907 N.E.2d 997, 1002 (Ind. 2009) ........ 26

*Johnson v. State*,
804 N.E.2d 255 (Ind. Ct. App. 2004) ........ 23

**Table of Authorities—cont'd**

**Cases** **Page**

*Johnson v. United States*,
559 U.S. 133 (2010) .................... 18, 19, 23, 27

*Klikno v. United States*,
928 F.3d 539 (7th Cir. 2019) .................... 20, 23

*Mann v. State*,
895 N.E.2d 119 (Ind. Ct. App. 2008) .................... 22, 24, 25

*Molina-Martinez v. United States*,
578 U.S. 189 (2016) .................... 28

*Perry v. State*,
78 N.E.3d 1 (Ind. Ct. App. 2017) .................... 6, 21

*Rosales-Mireles v. United States*,
585 U.S. 129 (2018) .................... 28

*Rutledge v. United States*,
517 U.S. 292 (1996) .................... 30

*Smith v. State*,
167 N.E.3d 378 (Ind. Ct. App. 2021) .................... 8

*Stark v. State*,
489 N.E.2d 43 (Ind. 1986) .................... 23, 24

*Stokeling v. United States*,
586 U.S. 73 (2019) .................... *passim*

*Toney v. State*,
961 N.E.2d 57 (Ind. Ct. App. 2012) .................... 23, 24

*Tucker v. State*,
725 N.E.2d 894 (Ind. Ct. App. 2000) .................... 23, 24

*Woods v. State*,
460 N.E.2d 503 (Ind. 1984) .................... 25

*United States v. Abbas*,
560 F.3d 660 (7th Cir. 2009) .................... 28

## Table of Authorities—cont'd

**Cases** **Page**

*United States v. Asbury*,
27 F.4th 576 (7th Cir. 2022) .......... 28

*United States v. Bloch*,
718 F.3d 638 (7th Cir. 2013) .......... *passim*

*United States v. Bravo*,
26 F.4th 387 (7th Cir. 2022) .......... 28

*United States v. Castleman*,
572 U.S. 157 (2014) .......... 20, 24

*United States v. Cureton*,
739 F.3d 1032 (7th Cir. 2014) .......... 16

*United States v. Curry*,
1:17-cr-15, 2018 WL 1835907 (N.D. Ind. 2018) .......... 12

*United States v. Dixon*,
27 F.4th 568 (7th Cir. 2022) .......... 17–19, 25

*United States v. Glispie*,
943 F.3d 358 (7th Cir. 2019) .......... 27

*United States v. Glispie*,
978 F.3d 502 (7th Cir. 2020) .......... 18, 27

*United States v. Grant*,
15 F.4th 452 (6th Cir. 2021) .......... 30

*United States v. Liestman*,
97 F.4th 1054 (7th Cir. 2024) .......... 16, 17

*United States v. Love*,
7 F.4th 674 (7th Cir. 2021) .......... 20, 26, 27

*United States v. Parker*,
508 F.3d 434 (7th Cir. 2007) .......... 29, 30

*United States v. Sanders*,
1:17-cr-29, 2019 WL 6487324 (N.D. Ind. 2019) .......... 12

**Table of Authorities—cont'd**


**Cases** **Page**

*United States v. Sineneng-Smith*,
590 U.S. 371 (2020) ........ 27

*United States v. Tann*,
577 F.3d 533 (3d Cir. 2009) ........ 30

*United States v. Thomas*,
426 F. App'x 459 (7th Cir. 2011) ........ 30

*United States v. Van Sach*,
104 F.4th 1003 (7th Cir. 2024) ........ 28

**Statutes** **Page**

Ind. Code § 35-31.4-2-204.5 (2016) ........ 8

Ind. Code § 35-31.5-2-29 (2012) ........ 5, 22

Ind. Code § 35-31.5-2-292 (2012) ........ 7

Ind. Code § 35-42-2-1.3 (2012) ........ 5, 21, 22

Ind. Code § 35-42-2-1.3(a) (2012) ........ 5, 8

Ind. Code § 35-42-2-1.3(a) (2016) ........ 8, 26

Ind. Code § 35-42-2-1.3(b)(1) (2012) ........ 6, 8, 21

Ind. Code § 35-42-2-1.3(b)(1) (2016) ........ 8, 26

Ind. Code § 35-42-2-1.3(b)(3) (2016) ........ 8, 17

Ind. Code § 35-50-2-7 (2026) ........ 8

18 U.S.C. § 922(g) ........ *passim*

18 U.S.C. § 922(g)(1) ........ *passim*

18 U.S.C. § 922(g)(9) ........ *passim*

18 U.S.C. § 3231 ........ 3

18 U.S.C. § 3553(a) ........ 13

18 U.S.C. § 3742 ........ 3

28 U.S.C. § 1291 ........ 3

**Table of Authorities—cont'd**


**Sentencing Guidelines** **Page**

U.S.S.G. § 2K2.1(a)(4) ....17, 23, 25

U.S.S.G. § 2K2.1(a)(4)(A) ....11, 27

U.S.S.G. § 2K2.1(a)(6) .... 11, 27

U.S.S.G. § 3E1.1(a) .... 11

U.S.S.G. § 3E1.1(b) .... 11, 27

U.S.S.G. § 4B1.2(a) .... *passim*

**Other Authorities** **Page**

1999 Ind. Legis. Serv. P.L. 188-1999 (H.E.A. 1747) (West) .... 5

2013 Ind. Legis. Serv. P.L. 158-2013 (H.E.A. 1006) (West) .... 8

2016 Indiana Act P.L. 65–2016 .... 26

Black's Law Dictionary 754 (7th ed. 1999) .... 22

Model Penal Code § 210.0(2) .... 7

Model Penal Code § 211.1 cmt. 3 .... 7

U.S. Dep't of Justice, Dep't Mem. 1431 (Nov. 3, 1992) .... 29

U.S. Dep't of Justice, Justice Manual § 9-63.514 (2026) .... 29

## Introduction

Jesse Graves was accosted in a heated argument by a person with a gun. So Mr. Graves went and got his own. But he isn't allowed to possess firearms because of his previous felony and misdemeanor convictions for domestic battery. A grand jury indicted him on two counts for possessing that gun—first under 18 U.S.C. § 922(g)(1) and then under § 922(g)(9). Having confessed several times to possessing the gun, Mr. Graves quickly pled guilty. The district court then sentenced him to concurrent sentences well above the calculated guideline range.

Two sentencing errors need to be corrected, though. *First*, the district court set his base offense level at 20 (rather than 14) after ruling that his 2012 felony domestic battery conviction was a crime of violence. But that was a mistake. Here's why: The Indiana Supreme Court held that the 2012 statute's bodily injury threshold is met by "*any* impairment" arising from a rude touching—no matter how slight, fleeting, or painless that impairment might be. *Bailey v. State*, 979 N.E.2d 133, 142 (Ind. 2012) (emphasis original). That was a legitimate and understandable state policy judgment about how to punish batteries resulting in *de minimis* impairments. But under the categorical approach, that valid policy judgment means that the least culpable conduct causing "bodily injury" in Indiana does not amount to "physical force" under the Sentencing Guidelines. So Mr. Graves's 2012 conviction is not a crime of violence.

*Second*, the district court plainly erred when it entered multiple convictions and sentences against Mr. Graves under § 922(g) for the same

incident of firearm possession. *United States v. Bloch*, 718 F.3d 638, 643 (7th Cir. 2013). It's true that he violated both § 922(g)(1) and § 922(g)(9) by possessing the gun. But he could only be convicted and sentenced under one provision. *Id.* That obvious error, as this Court has repeatedly held, must be corrected by vacating the judgment with instructions that one of Mr. Graves's convictions must be vacated and merged into the other. *Id.*

This Court should correct both errors and remand this case for resentencing under the correct guideline range based on a single conviction.

## Jurisdictional Statement[1]

This is an appeal from a criminal judgment following a guilty plea and sentencing. The United States District Court for the Northern District of Indiana had jurisdiction under 18 U.S.C. § 3231.

On December 18, 2024, a grand jury sitting in that district charged Jesse Graves with two counts of unlawful firearm possession—as a felon and as a person convicted of a misdemeanor crime of domestic violence. 18 U.S.C. §§ 922(g)(1), (9). (R. 1.) On April 11, 2025, the district court accepted Mr. Graves's guilty plea, which he entered by consent before a Magistrate Judge two weeks earlier. (Rs. 26–28, 31.)

The United States Court of Appeals for the Seventh Circuit has jurisdiction under 28 U.S.C. § 1291 and 18 U.S.C. § 3742. The district court sentenced Mr. Graves on January 29, 2026, and entered final judgment the same day. (Rs. 55, 56.) Mr. Graves timely appealed on January 30, 2026. (R. 59.) This is not an appeal from a final decision by a magistrate judge, and neither party filed a motion that would have tolled the appeal deadline.

[1] This brief uses the following abbreviations, with underscores representing pincites: The record on appeal is (R. #, at __.); the required attached short appendix is (App. __.); the presentence investigation report (R. 39), is (PSR ¶ __.).

## Statement of the Issues

**I.** Whether, using the categorical approach, Indiana's 2012 domestic battery statute required the use of "physical force" under the Sentencing Guidelines even though Indiana courts broadly interpret "bodily injury" to include momentary, minor, painless physical impairments.

**II.** Whether the district court plainly erred by failing to merge Mr. Graves's two convictions under 18 U.S.C. § 922(g) into a single conviction when the same incident of firearm possession gave rise to both convictions.

## Statement of the Case

On November 27, 2024, Jesse Graves returned to the scene of a dispute with a handgun. But as a person previously convicted of felony and misdemeanor domestic battery in Indiana (in 2012 and 2001, respectively), he was prohibited from possessing that gun by 18 U.S.C. §§ 922(g)(1) and (g)(9). He was indicted under both provisions and pled guilty to both offenses. At sentencing, the district court concluded that one of his prior convictions was a crime of violence under the Guidelines and then imposed an above-guideline, 60-month prison term.

We start by tracing the legal background of Indiana's domestic battery statute before turning to this case.

### I. Indiana's evolving standards for domestic battery and the degree of bodily injury required for a conviction.

Indiana added domestic battery as a stand-alone provision of its criminal code in July 1999. *See* 1999 Ind. Legis. Serv. P.L. 188-1999 (H.E.A. 1747) (West). That provision, Indiana Code § 35-42-2-1.3, was unchanged until 2012 and made unlawful to:

> knowingly or intentionally touch[] an individual who:
> (1) is or was a spouse of the other person;
> (2) is or was living as if a spouse of the other person …; or
> (3) has a child in common with the other person;
> in a rude, insolent, or angry manner that results in bodily injury ….

*Id.* § 35-42-2-1.3(a) (2012).

A separate statute, Indiana Code § 35-31.5-2-29 (2012), defines the phrase "bodily injury" to mean "any impairment of physical condition, including physical pain."

So the essential elements of domestic battery were (1) a knowing or intentional touch, (2) of a spouse or coparent, (3) in a rude, insolent, or angry manner, that (4) results in bodily injury. *Perry v. State*, 78 N.E.3d 1, 9–10 (Ind. Ct. App. 2017). Engaging in that conduct once was a Class A misdemeanor; twice (or more) was a Class D felony. *Id.* § 35-42-2-1.3(b)(1) (2012).

In 2012, the Indiana Supreme Court penned its seminal case on the bodily injury threshold. Elmer Bailey was convicted of domestic battery for poking his wife on her forehead with his finger in a way that caused her pain. *Bailey*, 979 N.E.2d at 134. The Indiana Court of Appeals reversed Mr. Bailey's conviction, though, on the ground that the *de minimis* pain that Ms. Bailey experienced did not impair her physical condition and thus did not amount to bodily injury. *See Bailey v. State*, No. 49A02-1106-CR-487, 2012 WL 350735, slip op. at 9 (Ind. Ct. App. Feb. 3, 2012) (unpublished).

The Indiana Supreme Court reversed the Court of Appeals and affirmed the conviction. *Bailey*, 979 N.E.2d at 143. It did so after extensively surveying the meaning of "bodily injury" under Indiana law. In the *Bailey* court's view, the bodily injury statute "create[ed] a very low threshold for 'bodily injury' while maintaining a much more rigorous standard for 'serious bodily injury.'" *Id.* at 137. Rejecting a *de minimis* pain requirement, the Indiana Supreme Court held that no "particular level of pain is required" because any physical pain "*is* an impairment of physical condition." *Id.* at 138. In that way, pain was sufficient but not necessary to prove bodily injury. *Id.* at 139 ("[P]hysical pain is a stand-alone qualification for bodily injury—distinct from impairment of physical condition.").

The *Bailey* court explained that Indiana's bodily injury requirement tracked the Model Penal Code and similar state laws that used a two-tier structure for assessing physical harm. *Id.* at 138–40. The higher tier "is reserved for that extreme conduct" that results in, for example, "a substantial risk of death," "permanent disfigurement," "extreme pain," and the like. *Id.* at 140 (citing IND. CODE § 35-31.5-2-292 (2012)). But "[a]ny *other* battery resulting in physical injury" falls into the "lower" and "much broader" tier of bodily injury. *Id.* Relying on the Model Penal Code, the *Bailey* court agreed that even "illness, or any impairment of physical condition," even if "caused indirectly" counts as "bodily injury." *Id.* at 139 (quoting Model Penal Code §§ 210.0(2), 211.1 cmt. 3).

That expansive reading was intentional. The court's explicit goal was to achieve "very broad coverage" for "conduct resulting in bodily injury." *Id.* at 140. Though "reasonable minds can differ" about whether such minor and fleeting impairments should qualify as "bodily injury," Indiana's Supreme Court chose that approach to achieve a variety of policy goals, including to capture the full range of domestic batteries. *Id.* at 141–42. Ultimately, the *Bailey* court did "not believe" that "the General Assembly intended" to let batterers who caused *de minimis* impairment to "face only a B misdemeanor." *Id.* at 142. Instead, the phrase "any impairment" in the statutory definition really means "*any* impairment of physical condition." *Id.* (emphasis original). That "impairment [need not] be significant or severe." *Id.* Recognizing just how expansive its interpretation was, the *Bailey*

court invited the Indiana General Assembly to address or reject its broad interpretation of what counts as a "bodily injury." *Id.* at 141.

Four years later, the General Assembly codified the *Bailey* court's expansive interpretation by removing the "bodily injury" requirement for Class A misdemeanors and recidivists. IND. CODE §§ 35-42-2-1.3(a), (b)(1) (2016).[2] The General Assembly also created a new felony for domestic battery resulting in moderate bodily injury, defined as "any impairment of physical condition that includes substantial pain." *Id.* §§ 35-31.4-2-204.5 (2016); 35-42-2-1.3(b)(3) (2016). That standard (as the phrase and definition imply) is higher than the anything-counts approach for bodily injury but less than the extreme-harm thresholds required for serious bodily injury. *Smith v. State*, 167 N.E.3d 378, 381–82 (Ind. Ct. App. 2021).

## II. Jesse Graves possesses a gun after being convicted of misdemeanor and felony domestic battery under the 2012 version of the domestic battery statute.

As a child and young adult, Jesse Graves struggled with anger management and emotional regulation—an issue his family attributed to his diminished mental faculties and difficulty processing and navigating complex emotions. (R. 49, Def.'s Sent. Mem., at 2–3; R. 50, Ex. A, Sent'g Video.) From the ages of 12 until 29, he accrued multiple battery convictions. (*See* PSR ¶¶ 33–70.) Particularly relevant here, he was convicted in 2001 of misdemeanor domestic battery under Indiana Code § 35-42-2-1.3(a) (2012) and again in 2012 of felony domestic battery under § 35-42-2-1.3(b)(1) (2012).

---

[2] Just to clarify terminology, Indiana overhauled its felony classification system in 2014, with a (pre-2014) class D felony being equivalent to a (post-2014) level 6 felony. *See* IND. CODE § 35-50-2-7 (2026); 2013 Ind. Legis. Serv. P.L. 158-2013 (H.E.A. 1006) (West).

(PSR ¶¶ 10, 46, 70; *see also* R. 44, Gov't Resp. at 3.) At the time of each offense, the "very low threshold for 'bodily injury'" applied. *Bailey*, 979 N.E.2d at 137.

More than a decade later, on November 27, 2024, Mr. Graves got into a heated argument. (PSR ¶¶ 4, 6.) After his antagonist pulled out a gun and threatened Mr. Graves and his wife, Mr. Graves went home, got his own gun, and returned. (*Id.* ¶ 9.) Concerned neighbors soon called 911 to report that people were arguing and waving guns around. (*Id.* ¶ 4.)

When police arrived, Mr. Graves discarded his firearm in the grass near his vehicle. (*Id.* ¶¶ 5, 6.) Police recovered the firearm and he soon admitted that he tossed it because he feared getting into trouble. (*Id.* ¶ 6.) A record check revealed that Mr. Graves could not possess the gun because he had a prior felony conviction (though he believed he could because his convictions were more than seven years old). (*Id.* ¶¶ 6, 9.)

After officers detained Mr. Graves, he admitted that the gun was his, that he retrieved it after the altercation for self-defense, and that he displayed it. (*Id.* ¶ 9.) Based on his admissions, Mr. Graves was arrested for possessing the firearm. (*Id.* ¶ 12.) He later admitted again, on a recorded phone call, that the firearm was his. (*Id.*)

### III. Mr. Graves receives concurrent 60-month sentences for possessing a gun in a way that violated two provisions of 18 U.S.C. § 922(g).

About a month after that incident, a grand jury returned a two-count indictment, alleging that Mr. Graves violated both 18 U.S.C. § 922(g)(1) and § 922(g)(9) by possessing the firearm on November 27, 2024. (R. 1, at 1–2.) The indictment alleged that Mr. Graves had twice been convicted of

felonies (domestic battery and cocaine possession), and that he had once been convicted of misdemeanor domestic battery. (*Id.* at 2.)

### A. Mr. Graves pleads guilty to violating 18 U.S.C. § 922(g)(1) and § 922(g)(9) by possessing a firearm on November 27, 2024.

About a month after his arraignment, Mr. Graves appeared before a Magistrate Judge to plead guilty without an agreement. (Rs. 26 (Hr'g), 64 (COP Tr.)). Mr. Graves agreed to enter his plea before the Magistrate Judge, and a Rule 11 colloquy ensued. (R. 64, at 6–14.) After advising Mr. Graves of his rights and the penalties he faced, the court explained that the indictment alleged that he violated § 922(g)(1) and § 922(g)(9) by possessing a firearm on November 27, 2024. (*Id.* at 14–16.) Mr. Graves agreed that he possessed the gun and that he had been convicted of a felony and a misdemeanor crime of domestic violence. (*Id.* at 16–17.)

As the government explained, its evidence showed that "[o]n November 27th, 2024" at about 11:11 p.m., police responded to a 911 call about people arguing and threatening others with guns. (*Id.* at 18.) Police responded, found Mr. Graves, and recovered a handgun from the grass nearby. (*Id.*) He then admitted the gun was his and that he had retrieved it after being threatened. (*Id.* at 19–20.) And, the government said, Mr. Graves had been convicted of felony and misdemeanor domestic battery. (*Id.* at 20.) Mr. Graves agreed and pled guilty to both counts. (*Id.* at 21–22.)

The Magistrate Judge recommended that the District Judge accept the guilty plea and that Mr. Graves "be adjudged guilty of the offenses charged in the two-count Indictment." (R. 27, at 2.) Fourteen days later, the district court accepted his guilty plea. (R. 29, at 1.)

### B. Mr. Graves argues that his prior felony conviction for domestic battery is not a crime of violence given how expansively *Bailey v. State* interpreted "bodily injury."

Ahead of sentencing, the probation office recommended (and the government supported) a base offense level of 20 for Mr. Graves. (PSR ¶ 22; R. 40, at 1.) It did so on the theory that his 2012 felony conviction for domestic battery was a crime of violence within the meaning of U.S.S.G. § 4B1.2(a). (PSR ¶ 73.) That meant that his base offense level was 20, not 14. *Compare* U.S.S.G. § 2K2.1(a)(4)(A), *with id.* § 2K2.1(a)(6). And because he quickly accepted responsibility, his final offense level was 17. (*Id.* ¶¶ 29–31.) Mr. Graves was also in criminal history category III, based on six criminal history points. (*Id.* ¶¶ 84, 86.) All in, this led to an advisory prison term of 30 to 37 months. (*Id.* ¶ 126.)

Mr. Graves objected to the finding that his 2012 domestic battery conviction was a crime of violence. (R. 40, Objs., at 1, 3.) If successful, Mr. Graves's objection would have roughly halved his guideline range:

| Scenario 1: Domestic Battery a COV | | Scenario 2: Domestic Battery *not* a COV | |
|---|---|---|---|
| Base Offense Level:<br>§ 2K2.1(a)(4)(A) | 20 | Base Offense Level:<br>§ 2K2.1(a)(6) | 14 |
| Acceptance of Responsibility:<br>§§ 3E1.1(a), (b) | -3 | Acceptance of Responsibility:<br>§ 3E1.1(a) | -2 |
| **Total Offense Level:** | 17 | **Total Offense Level:** | 12 |
| Criminal History Category: | III | Criminal History Category: | III |
| **Advisory Range** | 30 to 37 | **Advisory Range** | 15 to 21 |

Invoking the categorical approach, Mr. Graves argued that his 2012 felony domestic battery conviction was not a crime of violence. (R. 45, at 1.)

He pointed out an intra-district split on that question[3] and argued that *Bailey v. State* interpreted the statute's "bodily injury" requirement so broadly that it was not a categorical match under *Stokeling v. United States*, 586 U.S. 73, 84 (2019). (*Id.* at 6–9.) He argued that Indiana had interpreted the "any impairment" language so broadly that even minor, fleeting, indirect impairments or illness qualified. (*Id.* at 6.)

As the government admitted, violent force under the Guidelines requires more than "mere touching." (R. 46, at 2.) Yet, said the government, Indiana requires at least some physical impairment and so "[i]t follows that if there is actually an impairment, the force used to cause the impairment must have had the potential of causing physical pain or injury." (*Id.*)

### C. The court concludes that Mr. Graves's 2012 conviction is a crime of violence without addressing *Bailey v. State*.

The district court overruled Mr. Graves's objection because Indiana battery requires a bodily injury. (R. 47, at 3; App. 39.) As the court noted, under *Stokeling* and *Johnson*, the question is whether the level of force a statute requires could cause pain or injury—and domestic battery required "bodily injury." (*Id.*) Rather than address Mr. Graves's point that Indiana courts interpret the bodily injury requirement too broadly, though, the court simply "reaffirm[ed] its prior holdings" that domestic battery is a crime of violence. (*Id.*)

[3] *Compare United States v. Sanders*, No. 1:17-cr-29, 2019 WL 6487324, at *3 (N.D. Ind. Dec. 3, 2019) (unpublished) (Brady, C.J.) (holding Indiana domestic battery is a crime of violence), *with United States v. Curry*, 1:17-cr-15, 2018 WL 1835907, at *5 (N.D. Ind. Apr. 18, 2018) (unpublished) (Springmann, J.) (holding Indiana domestic battery is not a crime of violence).

### D. At sentencing, the court imposes concurrent 60-month sentences on both of Mr. Graves's convictions.

At sentencing, the district court addressed the PSR and the guideline calculation before turning to arguments about the 18 U.S.C. § 3553(a) factors. The court (without objection) adopted the PSR's factual recitations. (Sent. Tr. at 6; App. 6.) As for the guidelines, the court confirmed that it had overruled Mr. Graves's objection, so he faced an advisory guideline range of 30 to 37 months' imprisonment. (*Id.* at 4–7.)

From there, the court previewed the primary issues it was weighing. On the one hand, the court was concerned about Mr. Graves's lengthy, violent, and often drunken criminal history (most of which did not receive points under the Guidelines), plus the offense conduct. (*Id.* at 11–12.) On the other hand, he exhibited "extraordinarily prompt acceptance of responsibility in this case," and struggled with learning disabilities. (*Id.* at 12.)

The government advocated for an above-guideline, 48-month sentence. (*Id.* at 13.) In the government's view, Mr. Graves deserved such a sentence because he left the scene of an argument to retrieve a gun, returned, and waved it around. (*Id.* at 13–14.) On top of that, he had multiple domestic battery convictions and other convictions related to intoxication that did not receive any criminal history points (*Id.* at 14–19.)

Mr. Graves sought a within-guideline 30-month sentence. (*Id.* at 20.) His attorney argued that he's "a pretty simple guy" who often did not understand things clearly, like the fact that he could not possess a gun to go hunting or after a certain number of years had passed. (*Id.*) Though Mr. Graves lacked formal diagnoses, his family believed he was autistic. (*Id.*)

He was put in special education as a kid and made it to ninth grade with a 0.95 GPA. (*Id.* at 20–21; PSR ¶ 120.) His mental deficiencies and intellectual disabilities explained why he resorted to violence rather than problem solving. (App. 21–25.) And, counsel explained, though alcohol was a concern, his intellectual disabilities favored a shorter prison term followed by intensive, probation-led rehabilitation on supervised release. (*Id.* at 27–29.)

The court imposed concurrent, above-guideline, 60-month sentences on each conviction. (*Id.* at 32–33.) After addressing the § 3553(a) factors, the court added that "this is the sentence the Court would have imposed, even if it had ruled differently on the defendant's objection. The sentence imposed ultimately reflects the defendant's individual criminal history, and the unique offense conduct in this case." (*Id.* at 33.)

The court entered judgment on both counts; Mr. Graves timely appealed. (Rs. 56, 59; App. 41–47.)

## Summary of the Argument

Jesse Graves is entitled to be resentenced for two reasons. *First*, the district court wrongly classified his 2012 domestic battery conviction as a crime of violence. *Second*, the court plainly erred when it entered two convictions and imposed concurrent sentences for the same instance of firearm possession.

**1.** Indiana's 2012 domestic battery statute is not categorically a crime of violence under the Sentencing Guidelines. Though the statute required "bodily injury," Indiana courts understand that phrase so broadly that the least culpable conduct that could cause "bodily injury" under Indiana law does not meet the *Stokeling* standard for violent force. *Stokeling v. United States*, 586 U.S. 73, 84 (2019). Because the least culpable conduct that can cause bodily injury under Indiana law does not require violent force, Mr. Graves's 2012 conviction was not a crime of violence.

**2.** Beyond that problem, the court plainly erred when it imposed multiplicitous convictions for the same instance of firearm possession under 18 U.S.C. § 922(g)(1) and § 922(g)(9). As this Court has repeatedly held, "a person cannot be convicted of more than one § 922(g) crime based on a single incident of possession." *United States v. Bloch*, 718 F.3d 638, 643 (7th Cir. 2013) (vacating convictions under § 922(g)(1) and § 922(g)(9) arising from the same incident of possession). Those "convictions are … multiplicitous and must be merged" because they "arose from the same incident of firearm possession, and the only difference between them is the disqualified class to which [Mr. Graves] belonged." *Id.* at 643–44.

## Argument

This appeal involves two fundamental aspects of federal criminal law. The first is the categorical approach, which, "[f]or all the consternation it tends to elicit," nonetheless "serves an essential need" by vindicating "practical and Sixth Amendment concerns." *United States v. Liestman*, 97 F.4th 1054, 1056 (7th Cir. 2024) (en banc). For purposes of this appeal, the essential question is whether "*all* possible violations of" Indiana's 2012 domestic battery statute "would fall within Congress's chosen federal benchmark." *Id.* at 1057. Here, that benchmark is whether domestic battery "has as an element the use, attempted use, or threatened use of physical force against the person of another." U.S.S.G. § 4B1.2(a). Our focus is on the phrase "physical force." Because Indiana law defines the relevant force metric more broadly than federal law, Indiana's 2012 domestic battery statute is not a crime of violence.

The second issue is that Mr. Graves's dual convictions for the same episode of firearm possession were multiplicitous. In plain terms, "a single act of gun possession can result in only one conviction under 18 U.S.C. § 922(g), even if the defendant violated § 922(g) in multiple ways." *United States v. Cureton*, 739 F.3d 1032, 1041 (7th Cir. 2014) (citing *Bloch*, 718 F.3d at 643). Because Mr. Graves was convicted and sentenced for violating both § 922(g)(1) and § 922(g)(9) by possessing the same firearm at the same time, one of his convictions must "be vacated and merged into the other." *Bloch*, 718 F.3d at 644.

## I. Indiana's valid policy choice to construe "bodily injury" extremely broadly leads to the side effect that Indiana's 2012 version of domestic battery is not a crime of violence.

Jesse Graves was convicted in 2012 of domestic battery under Indiana law. That conviction required proof of "bodily injury." But Indiana defines "bodily injury" so broadly that a person can cause bodily injury without using "physical force," as the latter term is defined by federal law. So there is a categorical mismatch. The 2012 statute is not a crime of violence.[4] As this argument addresses a preserved legal issue, this Court's review is de novo. *United States v. Dixon*, 27 F.4th 568, 570 (7th Cir. 2022).

### A. This Court uses the categorical approach to determine whether a prior conviction is a crime of violence under the Sentencing Guidelines.

In § 2K2.1(a)(4), the Sentencing Guidelines increase the advisory penalty range if a person has previously been convicted of a "crime of violence." Section 4B1.2(a) defines a "crime of violence," in relevant part as an offense that "has as an element the use, attempted use, or threatened use of physical force against the person of another." U.S.S.G. § 4B1.2(a).

To decide whether an offense is a crime of violence under the Sentencing Guidelines, "federal courts apply a 'categorical approach.'" *Dixon*, 27 F.4th at 570. The approach is categorical in the sense that "real-world facts" are cut "out of the equation." *Liestman*, 97 F.4th at 1056–57.

---

[4] As noted above, Indiana has since amended the degree of force required for one category of felony domestic battery to require "moderate bodily injury." *See* IND. CODE § 35-42-2-1.3(b)(3). We don't dispute that the moderate-bodily-injury standard meets the *Stokeling* threshold for violent force.

Rather than ponder how the defendant committed his own offense, the Court focuses on the least culpable conduct that could violate the state statute. *Bridges v. United States*, 991 F.3d 793, 800 (7th Cir. 2021). And "if a person can commit" the state-law violation "in a way that falls outside the guideline definition," then the "offense is not a crime of violence." *Dixon*, 27 F.4th at 570.

In other words, this Court compares the elements of the state offense to the federal benchmark to see if the state offense necessarily (i.e., categorically) maps on to the federal standard. *Descamps v. United States*, 570 U.S. 254, 260–61 (2013). If, but only if, the elements of the state statute fit wholly within the federal benchmark (here, the meaning of "physical force" under U.S.S.G. § 4B1.2(a)) can the state conviction serve as a predicate offense. *Id.*

Though federal law controls the meaning of physical force under the Sentencing Guidelines (more on that momentarily), this Court is "bound … by the [Indiana] Supreme Court's interpretation of state law." *Johnson v. United States*, 559 U.S. 133, 138 (2010). In that way, a categorical mismatch can arise either from the state's statutory text or the state court's interpretation of that statute (or both). *Id.* So when a state's highest court interprets a state statute more expansively than the statutory text seems to require, that expansive interpretation controls the categorical approach analysis. *See, e.g.*, *United States v. Glispie*, 978 F.3d 502, 503 (7th Cir. 2020) (holding a categorical mismatch arose based on the Illinois Supreme Court's interpretation of its burglary statute).

### B. The Supreme Court has explained that crimes of violence under federal law require physical force that could cause injury to another.

In recent years, the Supreme Court has explored the degree of force required to qualify as a crime of violence on three occasions. *See Delligatti v. United States*, 604 U.S. 423, 431–32 (2025); *Stokeling*, 586 U.S. at 84; *Johnson*, 559 U.S. at 140. Though *Stokeling* and *Johnson* addressed the Armed Career Criminal Act, the ACCA's use-of-force clause mirrors the Guideline's definition in § 4B1.2(a), so this Court applies those cases to the Guidelines. *Dixon*, 27 F.4th at 571.

In *Johnson*, the Court explained that "the phrase 'physical force' means *violent force*—that is, force capable of causing physical pain or injury to another person." 559 U.S. at 140 (citing *Flores v. Ashcroft*, 350 F.3d 666, 672 (7th Cir. 2003)). Physical force, in other words, does not "consist of the merest touch"—instead, it involves at least "that degree of force necessary to inflict pain." *Id.* at 143.

Nine years later, the Court clarified that "physical force" is satisfied by force sufficient "to overcome a victim's physical resistance." *Stokeling*, 586 U.S. at 83. That standard doesn't require actual injury, just "force *capable* of causing physical pain or injury." *Id.* at 84 (quoting *Johnson*, 559 U.S. at 140). That's not a terribly high bar: "*Johnson* thus does not require any particular degree of likelihood or probability that the force used will cause physical pain or injury; only potentiality." *Id.* But there must be at least the potential of physical injury. *Id.* To illustrate that point, the Court pointed to "force as small as 'hitting, slapping, shoving, grabbing, pinching, biting,

and hair pulling" as classic examples of "physical force" sufficiently "capable of causing physical injury" to qualify as a crime of violence. *Id.* at 85 (citing *United States v. Castleman*, 572 U.S. 157, 182 (2014) (Scalia, J., concurring in part)).

In *Delligatti*, the Supreme Court (perhaps unsurprisingly) held that second degree murder under New York law is a crime of violence. 604 U.S. at 436. Along the way, the Court confirmed that *Stokeling* adopted Justice Scalia's view of physical force in his separate opinion in *Castleman*. *Delligatti*, 604 U.S. at 431–32. So the degree of force that qualifies as "physical force" under federal law must exceed mere touching, but hitting, kicking, slapping, and the like all count. *Id.* at 432.

This Court has harmonized this line of cases by concluding (as the Supreme Court later confirmed in *Delligatti*) that "they require more than the simple offensive touching that the common law would have called for, but the requirement to show 'force sufficient to overcome a victim's resistance' is not a demanding one." *Klikno v. United States*, 928 F.3d 539, 547 (7th Cir. 2019) (citation omitted). As in *Delligatti*, this Court looks to Justice Scalia's examples of "hitting, slapping, shoving, grabbing, pinching, biting, and hair pulling" as the sort of force that goes beyond "mere offensive touching" and thus qualifies as "physical force" under federal law. *United States v. Love*, 7 F.4th 674, 679 (7th Cir. 2021) (addressing battery of a police officer under Indiana law); *see also Flores*, 350 F.3d at 672 (explaining that, under Indiana law, the force imparted by a wayward paper airplane creates bodily injury).

### C. Indiana's law of domestic battery requires "bodily injury," but Indiana's courts have construed that phrase to include "any impairment," including illness, no matter how slight.

Jesse Graves pled guilty in 2012 to committing domestic battery. *See* IND. CODE § 35-42-2-1.3(b)(1) (2012). (R. 44-1, Gov't Ex. 1, at 6.) Because the categorical approach applies, details of his offense don't matter. Instead, the elements of the offense take center stage. Here again, for ease of reference, is the statutory text:

> (a) A person who knowingly or intentionally touches an individual who:
>
> (1) is or was a spouse of the other person;
>
> (2) is or was living as if a spouse of the other person …; or
>
> (3) has a child in common with the other person;
>
> in a rude, insolent, or angry manner *that results in bodily injury* to the person described in subdivision (1), (2), or (3) commits domestic battery, a Class A misdemeanor.
>
> (b) However, the offense under subsection (a) is a Class D felony if the person who committed the offense:
>
> (1) has a previous, unrelated conviction:
>
> (A) under this section …; or
>
> (B) [a similar conviction in another jurisdiction] ….

*Id.* § 35-42-2-1.3 (2012) (italics added).

In short, then, domestic battery required touching a domestic partner in a rude, insolent, or angry manner that resulted in bodily injury. *See Perry*, 78 N.E.3d at 9–10 (discussing elements of domestic battery). This appeal focuses on the "bodily injury" requirement, which is a common element of the misdemeanor and felony versions of the offense. *See Bailey*, 979 N.E.2d

at 135–36.[5] Recall that "bodily injury" is "any impairment of physical condition, including physical pain." IND. CODE § 35-31.5-2-29 (2012).

That definition, the Indiana Supreme Court tells us, "creat[es] a very low threshold for 'bodily injury.'" *Bailey*, 979 N.E.2d at 137. Even insignificant, painless, fleeting physical impairments qualify as "bodily injury" under Indiana law. *Id.* at 142. Recall, too, that that was an intentional policy decision to cover the full range of even *de minimis* impairments arising from rude touches. *Id.* at 140–42. Ultimately, the *Bailey* court did "not believe" that "the General Assembly intended" to let any batterer slip through the gaps "and face only a B misdemeanor." *Id.* at 142. Rather, the phrase "any impairment" in the statutory definition really means "*any* impairment of physical condition." *Id.* (emphasis original).

To see how broadly that standard is applied, it's important to understand what qualifies as an "impairment." Indiana courts interpret "impairment" to mean "[t]he 'fact or state of being damaged, weakened, or diminished.'" *Mann v. State*, 895 N.E.2d 119, 122 (Ind. Ct. App. 2008) (citing *Fleming v. State*, 833 N.E.2d 84, 89 (Ind. Ct. App. 2005), in turn citing *Black's Law Dictionary* 754 (7th ed. 1999)). And while aggravated battery requires "protracted" impairment, *see id.*, bodily injury requires simply "any" impairment, *Bailey*, 979 N.E.2d. at 142.

[5] Because bodily injury is a necessary element of every offense under the 2012 version of Indiana Code § 35-42-2-1.3, there's no need to conduct a divisibility analysis. *See Descamps*, 570 U.S. at 263–65 (explaining that the modified categorical approach applies only if it matters which of several divisible crimes the defendant committed).

Applying that standard, Indiana law teaches that physical pain is sufficient, but not necessary, to establish "bodily injury." *Toney v. State*, 961 N.E.2d 57, 60 (Ind. Ct. App. 2012) (pain sufficient); *Johnson v. State*, 804 N.E.2d 255, 257 (Ind. Ct. App. 2004) (pain not necessary). Thus a single, painless bruise qualifies as a "physical impairment" sufficient to qualify as a "bodily injury" within the meaning of Indiana law. *Tucker v. State*, 725 N.E.2d 894, 897 (Ind. Ct. App. 2000).

But bruising is not required, for if the victim becomes sick, *Bailey*, 979 N.E.2d at 139, or ends up with temporary scars, *Stark v. State*, 489 N.E.2d 43, 48 (Ind. 1986), then the defendant has caused bodily injury. So too if the victim suffers "a painlessly broken fingernail." *See Hanic v. State*, 406 N.E.2d 335, 338 n.1 (Ind. Ct. App. 1980). And there's no durational threshold the impairment must meet, either. *Toney*, 961 N.E.2d at 60.

**D. Indiana's bodily injury requirement is not a categorical match for "physical force" under U.S.S.G. § 4B1.2(a).**

No doubt, the federal standard for physical force is low. *Klikno*, 928 F.3d at 547. But Indiana's bodily injury threshold is lower. *Bailey*, 979 N.E.2d at 139. That creates a categorical mismatch between Mr. Graves's 2012 domestic battery conviction and § 4B1.2(a), which means that his conviction is not a crime of violence within the meaning of § 2K2.1(a)(4).

The Supreme Court has been clear that physical force requires, at a minimum, "force *capable* of causing physical pain or injury." *Stokeling*, 586 U.S. at 84 (quoting *Johnson*, 559 U.S. at 140). There must be, at least, the potential for physical pain or injury. *Id.* To borrow Justice Scalia's list (adopted by the Court in *Stokeling* and *Delligatti*), physical force generally involves,

at least, "[h]itting, slapping, shoving, grabbing, pinching, biting, [and] hair pulling." *Castleman*, 572 U.S. at 182 (Scalia, J., concurring in part).

Indiana, for its part, made an understandable but critically distinct policy judgment about the degree of force required to inflict "bodily injury" as a state-law matter: "*any* impairment of physical condition" qualifies. *Bailey*, 979 N.E.2d at 142 (emphasis original). And not just impairments arising from pain—those impairments are sufficient but not necessary to meet Indiana's statutory standard. *Id.* Leaving a painless bruise meets that standard. *Tucker*, 725 N.E.2d at 897. A painless fleeting scar, *Stark*, 489 N.E.2d at 48, or a chipped fingernail, *Hanic*, 406 N.E.2d at 338 n.1, count too.

Yet Indiana's bodily injury statute—and the way Indiana's Supreme Court has interpreted it—is more capacious still. An "impairment" is anything that "damage[s], weaken[s], or diminish[es]" a person. *Mann*, 895 N.E.2d at 122. "*Any*" impairment, even if painless, meets the statutory standard. *Bailey*, 979 N.E.2d at 142. In other words, "the impairment [need not] be significant or severe," *id.*, and need not meet any "duration[al]" threshold, *Toney*, 961 N.E.2d at 60. So any painless physical impairment, no matter how fleeting, insignificant, or minor is a bodily injury under Indiana law. *Bailey*, 979 N.E.2d at 142. If one person gives another too much alcohol and the other person vomits; or if a parent chooses to pray for their sick child rather than seek medical attention; or if one spouse rudely but gently touches the other and causes an alopecia flare-up, then in each case there is bodily injury within the meaning of Indiana law. *See id.*

To be clear, those last few examples aren't the product of fanciful legal imagination—they illustrate the plain reach of the Indiana statute as understood by the controlling Indiana decision. Under *Bailey*, in each scenario (all adapted from real Indiana cases[6]) the person has committed domestic battery because "any impairment," (broadly defined, *see Mann*, 895 N.E.2d at 122), no matter how slight, insignificant, or painless meets the statutory standard. 979 N.E.2d at 142. *Bailey*'s language and logic suggest that even unwanted tickling or shining a flashlight into someone's eyes amounts to bodily injury.

Now that's a legitimate policy choice for Indiana to make regarding the degree of force required for misdemeanor domestic battery. *Bailey*, 979 N.E.2d at 141–43. But a collateral consequence is that Indiana's domestic battery statute includes more conduct under the banner of "bodily injury" than fits into the federal definition of "physical force." As a categorical matter, then, Mr. Graves's 2012 conviction did not entail the sort of "physical force" required by U.S.S.G. § 4B1.2(a) and thus is not a predicate crime of violence under § 2K2.1(a)(4). *Dixon*, 27 F.4th at 571.

The Indiana legislature's post-*Bailey* amendments to the domestic battery statute underscore this point. Following *Bailey*'s invitation to the General Assembly to explain if "only a B misdemeanor" was appropriate for *de*

[6] *See Alexander v. Scheid*, 726 N.E.2d 272, 284 (Ind. 2000) (exacerbating symptoms), cited by *Bailey*, 979 N.E.2d at 142; *Hall v. State*, 493 N.E.2d 433, 435 (Ind. 1986) (praying rather than seeking medical care); *Woods v. State*, 460 N.E.2d 503 (Ind. 1984) (hair loss); *see also Hardiman v. State*, No. 18A-CR-317, 2018 WL 5020712, at *3 (Ind. Ct. App. 2018) (unpublished) (vomiting from alcohol).

*minimis* impairments, 979 N.E.2d at 141, 142, the legislature clarified that no bodily injury is required for the Class A misdemeanor and Level 6 felony offense for recidivists. *See* IND. CODE §§ 35-42-2-1.3(a), (b)(1) (2016); 2016 Indiana Act P.L. 65–2016, 547–48. Mr. Graves was convicted under a version of the statute whose bodily injury threshold was so "very low," *Bailey*, 979 N.E.2d at 137, that the General Assembly soon clarified that any touching qualified. *See Ind. Dep't of Revenue v. Kitchin Hosp., LLC*, 907 N.E.2d 997, 1002 (Ind. 2009) ("Where it appears that the Legislature amends a statute to express its original intention more clearly, the normal presumption that an amendment changes a statute's meaning does not apply."). Bodily injury under Indiana law does not categorically meet the level of physical force required by the Guidelines.

**E. This Court's decision in *United States v. Love* does not require a different result.**

We acknowledge that this Court in *United States v. Love* addressed Indiana battery of a police officer and quickly concluded that it was an ACCA predicate because it required "bodily injury." 7 F.4th at 680–81. But *Love* does not require affirmance here because neither party raised the categorical mismatch between "physical force" and "bodily injury" based on how broadly the Indiana courts have interpreted the latter phrase. *See id.* No one pointed out that "any impairment" does not require force capable of causing pain—just contact that results in momentary diminishment of the person. *See id.*

So this Court's analysis stopped at the statutory language without considering whether judicial gloss broadened that language beyond the reach

of federal law. To be fair, this Court had no occasion to consider the categorical approach problem that *Bailey* creates because no one raised it, and this Court does not generally address unraised arguments. *United States v. Sineneng-Smith*, 590 U.S. 371, 375–76 (2020).

Even so, this Court is "bound by Indiana's determination of the elements of its criminal statute." *Love*, 7 F.4th at 679. When, as here, a State Supreme Court interprets a statute more broadly than its text seems to require, this Court must follow that interpretation. *Johnson*, 559 U.S. at 137–38. That remains true even if the state court's interpretation creates a categorical mismatch between the state offense and the federal benchmark. *See, e.g.*, *United States v. Glispie*, 943 F.3d 358, 369 (7th Cir. 2019) (certifying to the Illinois Supreme Court a question of statutory interpretation on residential burglary); *Glispie*, 978 F.3d at 503 (holding that Illinois residential burglary is a categorical mismatch based on the Illinois Supreme Court's answer to the certified question).

### F. The district court's error was not harmless because it did not explain why a five-level decrease to Mr. Graves's offense level was irrelevant to the court's sentencing decision.

Classifying Mr. Graves's domestic battery conviction as a crime of violence increased his base offense level by six. *Compare* U.S.S.G. § 2K2.1(a)(4)(A), *with* § 2K2.1(a)(6). This led to a five-level increase in his final offense level (because of how § 3E1.1(b) operates) and effectively doubled his advisory sentencing range. Rather than an advisory prison term of 15 to 21 months, the district court wrongly started from a range of 30 to 37 months' imprisonment. That presumptively prejudicial error ought to be

corrected. *Molina-Martinez v. United States*, 578 U.S. 189, 198 (2016); *Rosales-Mireles v. United States*, 585 U.S. 129, 139 (2018).

Indeed, this Court reverses such errors unless the government can show that the error was harmless. *United States v. Asbury*, 27 F.4th 576, 580 (7th Cir. 2022). One way to demonstrate harmlessness is if the district court provides "'a detailed explanation' of the basis for a 'parallel result.'" *Id.* (quoting *United States v. Abbas*, 560 F.3d 660, 667 (7th Cir. 2009)). An "inoculating statement" can render guideline errors harmless if the court details why the potential error did not matter. *Id.* at 581–82.

Here, the district court offered a terse inoculating statement that was not detailed and did not articulate a parallel result. *United States v. Van Sach*, 104 F.4th 1003, 1006 (7th Cir. 2024) (per curiam). Instead, the court simply said that it would impose the same sentence. It did not provide a "detailed" explanation why a five-level decrease to Mr. Graves's final offense level "would not 'affect the ultimate outcome.'" *Asbury*, 27 F.4th at 581–82. (citing *United States v. Bravo*, 26 F.4th 387, 397 (7th Cir. 2022)). Though the court imposed an above-guideline sentence, the court did not explain why it would just as readily impose a sentence quadruple the low end of Mr. Graves's guideline range rather than merely double it. *See Van Sach*, 104 F.4th at 1006–07. Resentencing is required. *Id.*

## II. Mr. Graves's dual convictions under 18 U.S.C. §§ 922(g)(1) and (g)(9) for the same conduct are plainly erroneous.

Mr. Graves was convicted under 18 U.S.C. § 922(g)(1) and § 922(g)(9) for possessing one firearm on November 27, 2024. His convictions are "impermissibly multiplicitous because they arise from a single incident of

firearm possession involving the same gun." *United States v. Parker*, 508 F.3d 434, 439–40 (7th Cir. 2007). He did not raise this issue below, so this Court's review "is limited to plain error." *Id.*

A defendant cannot be convicted for violating multiple provisions of § 922(g) for "a single act of possession." *United States v. Bloch*, 718 F.3d 638, 643 (7th Cir. 2013). In *Bloch*, as here, the defendant was convicted under both § 922(g)(1) and § 922(g)(9) for one act of possession. This Court reversed in *Bloch* after the U.S. Attorney's Office for the Northern District of Indiana pointed out that a single incident of possession can result in "only one conviction," even if "the defendant may belong to more than one disqualified class." *Bloch*, 718 F.3d at 643 (citing *Parker*, 508 F.3d at 440). Though the defendant didn't make that argument, this Court reversed (and "commend[ed] the government for raising the error"). *Id.* at 644.[7]

So too here.

As this Court has repeatedly held, entering judgment on multiplicitous convictions under § 922(g) for the same instance of firearm possession is plainly erroneous. *Parker*, 508 F.3d at 441; *Bloch*, 718 F.3d at 643–44 (reversing even though defendant never objected to his multiple convictions); *see*

[7] The government's commendable confession in *Bloch* aligns with the Justice Manual. "[A] defendant should not be punished separately under two or more separate subdivisions of § 922(g) for a single instance of unlawful weapons possession." U.S. Dep't of Justice, Justice Manual § 9-63.514 (2026). The Justice Manual explains that prosecutors should not seek multiple sentences for one act that violates multiple parts of § 922(g) but should "urge the court to 'merge' or 'combine' the multiple § 922(g) convictions into one conviction for sentencing purposes." *Id.*; *see also* U.S. Dep't of Justice, Dep't Mem. 1431 (Nov. 3, 1992), available at https://www.justice.gov/archives/jm/criminal-resource-manual-1431-department-memorandum-prosecutions-under-922g (last visited June 23, 2026).

*also United States v. Thomas*, 426 F. App'x 459, 461 (7th Cir. July 27, 2011) (non-precedential) (same). That's true whether the multiplicitous convictions result in a longer sentence, *Bloch*, 718 F.3d at 644, or just an additional special assessment, *Parker*, 508 F.3d at 441 (citing *Rutledge v. United States*, 517 U.S. 292, 302 (1996)). Indeed, the Supreme Court has "held that a multiplicitous conviction must be vacated *regardless* of whether an increased sentence or extra assessment was imposed, based on the stigma, impeachment potential, and effect on future sentencing or parole eligibility." *Id.* (citing *Ball v. United States*, 470 U.S. 856, 864–65 (1985)).

To be clear, the problem is not the verdict or plea per se. Instead, the problem is the multiple sentences and convictions. If a "jury return[s] guilty verdicts for each count" then "the district judge should enter judgment on only one of the statutory offenses." *Ball*, 470 U.S. at 865. So the error was in entering judgment on both convictions and sentences, not accepting the plea itself. *Id.*; *see also United States v. Grant*, 15 F.4th 452, 456–57 (6th Cir. 2021) (finding plain error because the defendant pled guilty to violating both § 922(g)(1) and § 922(g)(9)); *United States v. Tann*, 577 F.3d 533 (3d Cir. 2009) (finding plain error after the defendant pled to two counts of violating § 922(g)(1) by possessing a handgun and its ammunition).

Here, the district court entered judgment and concurrent sentences on two convictions under 18 U.S.C. § 922(g) based on the same instance of firearm possession on November 27, 2024. As in *Bloch*, Mr. Graves's conduct violated both § 922(g)(1) and § 922(g)(9), but he could be convicted only under one subsection. *Bloch*, 718 F.3d at 643. "The proper remedy for

the multiplicity error is merger." *Id.* at 644. So "one conviction must be vacated and merged into the other" and Mr. Graves should be resentenced "on a single count of conviction." *Id.*

**Conclusion**

Jesse Graves was sentenced under the wrong guideline range because his conviction in 2012 for domestic battery was not a crime of violence. He was also wrongly subjected to multiple convictions for the same instance of firearm possession. This Court should reverse and remand.

Date: June 29, 2026

Respectfully submitted,

Northern District of Indiana
Federal Community Defenders, Inc.

By: *s/Jared Hamernick*

2929 Carlson Drive, Suite 101
Hammond, IN 46323
Telephone: (219) 937-8020
Fax: (219) 937-8021
Email: Jared_Hamernick@fd.org

**Certificate of Compliance with Type Volume Limits**

The undersigned certifies that this brief complies with the type-volume limitations of Federal Rule of Appellate Procedure 32(a)(7)(B) and Circuit Rule 32(c) in that, counting only the portions of the brief that count to the word limit, it contains 7,845 words as shown by Microsoft Word for Microsoft 365 used in preparing this brief.

This brief complies with the typeface requirements of Federal Rule of Appellate Procedure 32(a)(5) and the type-style requirements of Federal Rule of Appellate Procedure 32(a)(6) and Circuit Rule 32(c) because this brief has been prepared in a proportionally spaced typeface using Microsoft Word for Microsoft 365, with 13-point Palatino Linotype font. Footnotes are in 11-point font.

Date: June 29, 2026

s /*Jared Hamernick*
Jared E. Hamernick, Attorney for
Defendant-Appellant Jesse L. Graves

**Certificate of Service**

I hereby certify that on June 29, 2026, I electronically filed the foregoing with the Clerk of the Court for the United States Court of Appeals for the Seventh Circuit by using the CM/ECF system. I certify that all participants in the case are registered CM/ECF users, and that service will be accomplished by the CM/ECF system.

s /*Jared Hamernick*
Jared E. Hamernick, Attorney for
Defendant-Appellant Jesse L. Graves

No. 26-1192

# United States Court of Appeals for the Seventh Circuit

UNITED STATES OF AMERICA,
*Plaintiff-Appellee*,

*v.*

JESSE L. GRAVES
*Defendant-Appellant*.

Appeal from the United States District Court
for the Northern District of Indiana
Case No. 1:24-cr-49
The Honorable Holly A. Brady, Chief Judge

ATTACHED REQUIRED SHORT APPENDIX
OF DEFENDANT-APPELLANT JESSE L. GRAVES

NORTHERN DISTRICT OF INDIANA
FEDERAL COMMUNITY DEFENDERS, INC.

2929 Carlson Drive, Suite 101
Hammond, Indiana 46323
Telephone: (219) 937-8020
Fax: (219) 937-8021
Email: jared_hamernick@fd.org

JARED E. HAMERNICK
Assistant Federal Defender

Attorney for Defendant-Appellant
JESSE L. GRAVES

**Table of Contents for Appendix**

1. Certificate of Compliance with Circuit Rule 30 .................................... App. i

2. Transcript of Sentencing Hearing, January 29, 2026 .......................... App. 1

3. Opinion and Order, January 7, 2026 .................................................. App. 37

4. Judgment in a Criminal Case, January 29, 2026 ................................. App. 41

**Certificate of Compliance with Circuit Rule 30**

The undersigned counsel hereby states that all of the materials required by Circuit Rule 30(a) and (b) are included in the Appendix.

Date: June 29, 2026

s / *Jared Hamernick*
Jared E. Hamernick, Attorney for
Defendant-Appellant Jesse L. Graves

THE UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF INDIANA
FORT WAYNE DIVISION

| | | |
|---|---|---|
| UNITED STATES of AMERICA, Plaintiff, | ) | |
| | ) | CAUSE NO: 1:24-cr-49 |
| v. | ) | |
| JESSE GRAVES, Defendant. | ) | |

TRANSCRIPT OF SENTENCING HEARING HELD JANUARY 29, 2026, BEFORE THE HONORABLE HOLLY A. BRADY, UNITED STATES DISTRICT COURT JUDGE

APPEARANCES:

**FOR THE GOVERNMENT:** STACEY SPEITH, AUSA
DAWN RANSOM, AUSA
3128 Federal Building
Fort Wayne, Indiana 46802

**FOR THE DEFENDANT:** MICHELLE KRAUS, ESQ.
200 E. Main Street
Suite 905
Fort Wayne, Indiana 46802

ALSO PRESENT: The Defendant in person

Mallory Stanley, USPO

*TINA GALLUCCI, RMR, CRR, FCRR*
*CERTIFIED REALTIME REPORTER*
*1300 South Harrison Street*
*Suite 2105*
*Fort Wayne, Indiana 46802*
*tina_gallucci@innd.uscourts.gov*
*(260) 423-3060*

(Whereupon, the following proceedings were held on January 29, 2026, in open court; the defendant appearing in person and with his counsel:)

**THE CLERK:** All rise. The Honorable Holly A. Brady presiding.

**THE COURT:** Good morning.

**ALL COUNSEL:** Good morning.

**THE COURT:** Please be seated. We're on the record now in the matter of the United States of America versus Jesse Graves, in case number 1:24-cr-49.

Let the record reflect that the government is being represented by Assistant United States Attorneys Stacey Speith and Dawn Ransom. The defendant is present in person and with his counsel, Michelle Kraus.

During this hearing, I'll need to ask the defendant some questions and he may also wish to make a statement on his own behalf. So before we begin, I would ask that the defendant please stand, raise your right hand, and be sworn.

(Whereupon, the Defendant was administered the oath.)

**THE DEFENDANT:** Yes, Your Honor.

**THE COURT:** Please be seated.

Mr. Graves, do you understand that you're now under oath, and if you answer any of my questions falsely, or if you knowingly make any false statements, your false answers or false statements could later be used against you in another

prosecution for perjury?

**THE DEFENDANT:** Yes, Your Honor.

**THE COURT:** I would first like to set into the record the procedural history with respect to Mr. Graves' guilty plea.

On March 27th, 2025, the defendant appeared before Magistrate Judge Susan Collins and entered a plea of guilty to Counts One and Two of the Indictment, charging him in Count One with felon in possession of a firearm and forfeiture, in violation of 18 U.S.C. Section 922(g)(1), and charging him in Count Two with possession -- or I'm sorry, person convicted of a misdemeanor crime of domestic violence and possession of a firearm and forfeiture, in violation of 18 U.S.C. Section 922(g)(9).

On April 11th, 2025, the Court adopted the findings and the recommendations and the defendant was adjudged guilty on his plea of guilty.

I received from the Probation Officer a Final Presentence Investigation Report, together with an addendum on June 25th, 2025. Those documents appear at docket entries 39 and 40.

I also received a second addendum from the Probation Officer on January 27th, 2026, and that appears at docket entry 53.

Who will be speaking on behalf of the government?

**ATTORNEY STACEY SPEITH:** I will, Your Honor.

**THE COURT:** Ms. Speith, did you receive the Presentence Investigation Report and the addenda before today's hearing?

**ATTORNEY STACEY SPEITH:** Yes, Your Honor.

**THE COURT:** And Ms. Kraus, did both you and your client receive a copy of the Presentence Investigation Report and the addenda before today's hearing, with a sufficient opportunity to file any objections?

**ATTORNEY MICHELLE KRAUS:** We have, Judge.

**THE COURT:** Mr. Graves, to confirm, did you have enough time to review the Presentence Investigation Report and the addenda with Ms. Kraus before today's hearing?

**THE DEFENDANT:** Yes, Your Honor.

**THE COURT:** The Presentence Investigation Report and the addenda have been placed in the record under seal. It is directed that if an appeal is taken, counsel on appeal shall be permitted access to the sealed report.

It is further directed that counsel on appeal shall not be permitted access to the recommendation section of the report, which was filed separately.

The initial addendum to the Presentence Investigation Report identified objections by the defendant. The defendant filed an objection to the base offense level of 20, based upon the Probation Officer's conclusion that the defendant's prior conviction for domestic battery in case number

02D04-1203-FD-785 was a crime of violence.

The parties submitted briefing to the Courts based upon the objection and on January 7th, 2026, the Court issued an opinion and order overruling the objection at docket entry 47.

The defendant also filed an objection to paragraph 41 in the draft, which the Court deemed moot after the Probation Officer removed the reference in the final report.

And, finally, the defendant objected to information contained in paragraph 60 regarding threats of violence involving law enforcement. The Court overruled the objection at the January -- pardon me -- June 26, 2025 status conference.

Ms. Speith, do you have anything to add to the procedural history?

**ATTORNEY STACEY SPEITH:** No, Your Honor.

**THE COURT:** Do you agree there are no remaining objections or disputes as to the facts contained in the Presentence Investigation Report?

**ATTORNEY STACEY SPEITH:** I agree.

**THE COURT:** Ms. Kraus, do you have anything to add to the procedural history?

**ATTORNEY MICHELLE KRAUS:** I do not.

**THE COURT:** Do you agree there are no remaining objections or disputes as to the facts contained in the Presentence Investigation Report?

**ATTORNEY MICHELLE KRAUS:** We do.

**THE COURT:** There being no objections to the factual statements contained in the Presentence Investigation Report, the Court hereby adopts those statements as its findings of fact.

Turning our attention now to the defendant's acceptance of responsibility, which is one of the factors impacting the calculation of the guidelines, on June 3rd, 2025, at docket entry 34, the government filed a notice for an additional one-level decrease under Section 3E1.1B, because the defendant timely notified the United States Attorney's Office of his intention to plead guilty, thereby permitting the government and the Court to allocate their resources efficiently.

Ms. Speith, do you have anything to add with respect to the notice?

**ATTORNEY STACEY SPEITH:** No, Your Honor.

**THE COURT:** The Court will grant the additional one-level decrease under Section 3E1.1B, because the defendant assisted authorities in the investigation and prosecution of his own misconduct by timely notifying the United States Attorney's Office of his intention to plead guilty.

The Court notes that the Probation Officer included this reduction at paragraph 30.

I also want to confirm counsel's understanding of the application of the Advisory Guidelines. Taking into account

the conclusions adopted from the Presentence Investigation Report, the Court finds that the following apply under the Guidelines: The defendant's total offense level is 17. The defendant's criminal history category is three. The defendant faces a range of imprisonment of 30 to 37 months on Counts One and Two. The defendant is not eligible for probation. The defendant faces a range of one to three years of supervised release on Counts One and Two. The range for a fine is $10,000 to $95,000. Restitution is not applicable, and a $200 special assessment will apply, representing $100 per count of conviction.

Ms. Speith, based upon my findings to this point in the record, are the calculations accurate?

**ATTORNEY STACEY SPEITH:** They are, Your Honor.

**THE COURT:** And Ms. Kraus, based upon my findings to this point in the record, are the calculations accurate?

**ATTORNEY MICHELLE KRAUS:** They are.

**THE COURT:** Officer Stanley, have any feedback for the Court with respect to the announcement of the Guidelines?

**PROBATION OFFICER STANLEY:** No, Your Honor.

**THE COURT:** The Court hereby adopts the conclusions in the report regarding the application of the Advisory Guidelines.

Before I hear argument regarding an appropriate sentence to impose, I would first like to address the Court's notice of

proposed conditions of supervised release. which were issued on June 6, 2025, at docket entry 42. There were 21 conditions and those conditions would apply after Mr. Graves' term of imprisonment when he transitions back to the community. I want to ensure that there are no objections and that the defendant understands them.

Ms. Kraus, did you receive and review the proposed conditions of supervised release with the defendant?

**ATTORNEY MICHELLE KRAUS:** I have, yes.

**THE COURT:** And do you have any argument to present with respect to the terms of supervised release?

**ATTORNEY MICHELLE KRAUS:** No, ma'am, we just believe they are sufficiently tailored to his needs.

**THE COURT:** And is your client willing to waive the Court's oral pronouncement of the conditions at the time I announce sentence, understanding that these same conditions will be incorporated by reference and appear in the judgment?

**ATTORNEY MICHELLE KRAUS:** He does.

**THE COURT:** Thank you. Mr. Graves, did you have enough time to review the proposed conditions of supervised release with Ms. Kraus?

**THE DEFENDANT:** Yes, Your Honor.

**THE COURT:** Understanding that these are the conditions you will be expected to live by upon your release from any term of imprisonment, do you have any questions or

concerns about those proposed conditions?

**THE DEFENDANT:** No, Your Honor.

**THE COURT:** And will you waive reading?

**THE DEFENDANT:** Yes, Your Honor.

**THE COURT:** Ms. Speith, does the government have any concerns with the respect to the proposed conditions of supervised release?

**ATTORNEY STACEY SPEITH:** No, Your Honor.

**THE COURT:** Okay. I want to thank counsel for each submitting their respective sentencing memoranda. The government submitted their sentencing memorandum on January 22nd, 2026, at docket entry 51, and Ms. Kraus submitted a sentencing memorandum and video on behalf of the defendant on January 22nd, 2026, at docket entries 49 and 50.

I have reviewed each of the sentencing memoranda and the video in preparation for today's hearing.

But do the parties have any additional evidence they wish to present, and after that, we'll hear argument?

**ATTORNEY STACEY SPEITH:** Yes, Your Honor, I do have some evidence I would like to present.

**THE COURT:** Go ahead.

**ATTORNEY STACEY SPEITH:** I have clips of three body cams and a 911 call I'm going to play for the Court so I can address the factual allegations in my argument.

The 911 call I'm going to play is, just so you know, it's

redacted. They took the victim's name -- it's a third party, so their names and address and phone number, there will be gaps for that.

**THE COURT:** Okay. And has Ms. Kraus seen these?

**ATTORNEY STACEY SPEITH:** She -- these were -- I'm sorry. I'm going to stop this for a second. These were all given in discovery.

**THE COURT:** Okay.

**ATTORNEY STACEY SPEITH:** And I believe she got the redacted version of the 911 call as well.

**ATTORNEY MICHELLE KRAUS:** Yeah, I haven't listened to them recently. I didn't know they were going to be used, but I have received them.

**THE COURT:** Okay. Go head.

(Whereupon, the audio is playing.)

**ATTORNEY STACEY SPEITH:** Next clip, Your Honor, will just be a clip of the first responding officer. I'm just going to play about a minute and a half and then I'll move on.

(Whereupon, the audio is playing.)

**ATTORNEY STACEY SPEITH:** Thank you, Your Honor. The next video I'm going to play kind of takes over when that officer leaves so we can hear what Mr. Watson (sic) says, Mr. Graves says, excuse me.

(Brief pause in the proceedings.)

**ATTORNEY STACEY SPEITH:** Sorry. Computers sometimes

don't work the way I like them to work.

(Whereupon, the audio is playing.)

**ATTORNEY STACEY SPEITH:** And the third video is another officer who talks to his wife on the scene.

(Brief pause in the proceedings.)

**ATTORNEY STACEY SPEITH:** I'm sorry. Try opening and it doesn't want to play.

(Whereupon, the video is playing.)

**ATTORNEY STACEY SPEITH:** Okay. Thank you, Your Honor. That's all the evidence that I wanted to present. Thank you.

**THE COURT:** Thank you, Ms. Speith.

Ms. Kraus, do you have any additional evidence you wish to present?

**ATTORNEY MICHELLE KRAUS:** No.

**THE COURT:** Okay. The Sentencing Guidelines are just one of the factors that influence the Court in the exercise of its discretion as to the proper sentence to impose. I will now invite the parties to provide argument.

Before doing so, I'll let you know a little bit about my prep. I don't think the lawyers are going to be the least bit surprised about what I'm going to tell you. And that is Mr. Graves' criminal history is extremely aggravating in this case.

His criminal history spans about 30 years and there is

incident after incident after incident that involves violence. So that's aggravating.

The offense conduct in this case is aggravating. This wasn't a mere possession case like we will see on occasion. In this case, he was actually threatening an individual with a firearm. And to make it worse, he didn't just leave, he left, and then he could have called the police when he said hey, so and so pulled a gun on me. But he went home, and he got a firearm and came back and threatened the individual with the firearm.

And then, I've seen this. It indicates in some of the documents that he appeared intoxicated. He appeared intoxicated to me. His criminal history is full of incidents in which he's intoxicated, and then he tells our Probation Officer he doesn't have any problem with drinking.

So I just -- the thought process of going back home and doing this while you're under the influence, thank goodness nothing bad happened here. Thank goodness nobody discharged a firearm in this case. But these facts and this criminal history are aggravating.

I've also, of course, considered the mitigating circumstances in this case. Mr. Graves has extraordinary counsel in this case, and he accepted with extraordinarily prompt acceptance of responsibility in this case.

He indicated he had the gun, you know, but in the jail

calls he's also saying he thinks he can have a gun. But nonetheless, he accepted responsibility, so that is a mitigator in this case.

He has family support. Some of them are here to support him today. He has the support of his church. I considered those facts.

I also considered his learning disability and the impact that that might have on his decision making. But that's been an issue in his life for 30 years, and he continues to drink and then make bad decision upon bad decision.

So, again, I would suspect that counsel probably could have listed out what I was going to say are aggravating and mitigating in this circumstances, but wanted to make sure we're all on the same page.

So with that, Ms. Speith, what's your position as to an appropriate sentence to impose?

**ATTORNEY STACEY SPEITH:** Thank you, Your Honor. And yes, I'm going to echo a lot of what you said. I think a lot of that was in my sentencing memorandum, and the big reason why I played this for you.

The government is asking for an above-guideline range sentence of 48 months. And I think that's what we put in our sentencing memorandum.

**ATTORNEY MICHELLE KRAUS:** It is.

**ATTORNEY STACEY SPEITH:** And that's what I'm asking

for today, and for the following reasons, Your Honor: One is the offense conduct.

Unlike, and maybe I misread the memo, the sentencing memo, I got that the defendant immediately admitted that he had a gun, we confirmed by officers, and he did not leave the scene, he chose to stay there when he was threatened.

That's not what happened in this case. What happened in this case, there was some sort of altercation with a friend or neighbor or whoever, the people would not cooperate, and he left the scene and he returned with a firearm.

And when the officers are pulling up, he ditched the firearm, and then I counted no less than 12 times denied having a firearm, until eventually he did admit he had a firearm after they located it and confront him with the evidence.

So he did, eventually, that day admit he had a firearm, but not until after at least a dozen denials of having a firearm. And the fact he was drunk and he left the scene, got a weapon and came back, you're right, who knows what would have happened.

I mean, we had individuals who weren't involved in the altercation, neighbors who called the police, because they were disturbed there was going to be gun violence in their neighborhood. They described the defendant as walking around pacing, waiving the gun, they tried to call them out of the

house. So that's very extremely aggravating factors in this case.

The defendant's criminal history is atrocious. What I count nine prior battery convictions over the course of his lifetime. And his criminal history category, as I indicated to you, is only three, with three criminal history points. But it's grossly understated. There are multiple offenses that did not receive any type of criminal history.

But when I looked through his criminal history -- and I'll start out on page 10 -- there was a domestic battery in which he has an altercation with him and the mother of his child, in which there is a battery to the mother of his child that he's convicted of.

Then the next police report, on page 10, where they encounter another woman who has indicated -- I believe it was a boyfriend, boyfriend or girlfriend, because it's a domestic battery -- that they began to argue, that he struck her. She said he pulls out a gun and says, "Bitch, I'll kill you." Then they found a gun at the scene.

The defendant denied he had a gun at that time, but the facts are she indicated he threatened her with a gun and the officers did, in fact, find a gun on the scene.

The next battery charge, Your Honor, is also on page 11. Now, again, officers are dispatched reference a fight. This is time with his girlfriend, Crystal, or actually they

encountered his girlfriend, Crystal. They did not fight. But they both had been drinking. His brother was there; his brother was arguing, too. At some point, his mom was there, and tried to get the defendant to leave and he grabbed his mom, and forced her out of the house, causing her to fall and hurt herself. And then he battered his brother.

And he was out on bond, on bail for domestic battery, at the time of that argument. And I forgot the one before, he had outstanding warrants when he got into the argument with Shana Foote (phonetic), and resulted in charges being filed.

Almost every single case. The next one is a public intoxication case. But the public intoxication case, and that case also involves a disturbance with a party armed, where there's another individual that calls the police regarding an altercation, a verbal altercation that turned violent, and where a knife was pulled. And I think she pulled a knife on him to protect him. But again the defendant is intoxicated when there's this argument going on.

Then there's a traffic stop, where the defendant is charged with disorderly conduct where he, in the course of that, is disruptive, boisterous and arguing with the officer, causing him to be arrested for disorderly conduct.

Never receiving a license conviction from 2025, again, the defendant is drinking. He's in an accident. He gets out of the vehicle, he takes his children, and begins to walk away

from the scene, because he has a failure to appear. And he's charged with never receiving a license and leaving the scene of an accident.

None of these received any type of criminal history points so far I'm talking about.

Then in 2026 he's charged with Operating While Intoxicated. And during the course of that arrest, he becomes verbally threatening to the officers, calling them names, killers with badges. Transporting him to jail, he threatened to kick their ass and is extremely disruptive and argumentative with the officers during their performance of their duty. Again, no criminal history points.

We keep going on to the next battery conviction from 2008. According to that, police, again, are dispatched to a fight at a tavern. The defendant's walking away. They talk to the victims and another male who said that the defendant attacked them as they left the bar, began going through their pockets, broke their cell phone when they tried to call the police and, again, the defendant is intoxicated -- .15 on the BAC. Again, no points.

The next public intoxication case, 2008, where there's dispatch reference a disturbance. And female is yelling, "Stop," and a male voice is responding, "I'm going to kill you." They arrive, they find the defendant, he's intoxicated, he's getting out of control, is very uncooperative with them.

So, again, we have this continued history of alcohol and violence and threats. More domestic batteries. The domestic battery from 2012, again, there's domestic battery at yet another woman. Again, the defendant is intoxicated. The victim has partially swollen eye, complained of pain to her nose. She said she was asleep, and she was holding her one-year-old son, and was awakened by the defendant yelling, "Bitch, don't lay in bed with my son like that. You're going to kill him in your sleep. I'll kill -- if you kill him, I'll kill you," and began punching her in the face.

The next resisting law enforcement in 2015 -- again, none of these received any criminal history points. Upon arrival, the officers seen the defendant actively pushing and fighting with a female, attempting to get into the house while the female was trying to keep him out. And they had to intervene. Again, no criminal history points.

The first time he gets criminal history points for a case, Your Honor -- well, actually had a possession of marijuana, but then we have an operating while intoxicated in 2024, where again, there's an operating while intoxicated, he failed to maintain his lane, he gets pulled over, he has signs of intoxication and he becomes angry and argumentative with the officers.

These are very violent combinations: Alcohol and violence and weapons. And that's what we have here with Mr. Graves.

And that's why I believe that Mr. Graves deserves a sentence that's above the guideline range, because the guidelines just don't adequately account for his criminal history and it doesn't adequately account for the defendant's actions in this case.

He possessed a firearm, but as you indicated he did more than just possess it. He retrieved a weapon when there was an altercation and he came back to confront an individual with a weapon while he's intoxicated.

There have been multiple opportunities for rehabilitation, to get Mr. Graves' attention, to get him to understand that alcohol is not a good combination. It's not something he should be using, because obviously, when he uses alcohol, he gets violent. He gets violent with weapons, he gets violence with physical altercations and with threats.

And it's for all of those reasons, Your Honor, the government truly believes this is a situation where the guideline sentence does not adequately affect (sic) -- adequately account for all the factors for sentencing under 3553(a). And we're asking that you do impose that sentence of 48 months.

And obviously, two years of supervised release, with alcohol counseling as part of the supervised release.

**THE COURT:** Thank you, Ms. Speith.

Ms. Kraus, what's your position?

**ATTORNEY MICHELLE KRAUS:** Judge, we would ask for a sentence of 30 months, which is the low end of the guidelines. You know, it's not clear from Jesse's criminal history or from information we have about his past is what exactly his mental capacity is.

And, to be honest, I'm almost of the opinion that anything I say is almost going to go over his head, because Jesse is a pretty simple guy. He doesn't understand things clearly at all.

And he has lived his entire life, fortunately, surrounded by -- you know, he's got this twin brother who loves him dearly, he's got family members who support him. But even, you know, on the video that we just saw his, his wife is like, "I fucking love my husband," or whatever she said, but she's sick of the way that he behaves. And the way he behaves because what's going on in his head.

And I don't think that, you know, based upon just the time that I've spent with him and that Bob has spent with him, and then the time that we spent talking to family members is -- and I think his younger brother is the one who says this -- Jesse is on the spectrum somewhere; he's autistic, at some point on that spectrum. He does not think the way the rest of us think.

He struggled in school. He was in Special Ed, according to his twin brother. You know, he only made it to the ninth

grade. And then even by his own words, Jesse's own words, he started acting a fool.

If you look at his criminal history, because so many of his criminal convictions are misdemeanors, I'm certain that his mental capacity was never ever considered by any other defense attorney before he ends up in federal court, you know. And I would bet -- because there's so many misdemeanor convictions, if Jesse was sitting in jail at the Allen County Jail on those misdemeanor -- the batteries, the resisting law enforcements, the OWI's, he's sitting there, I'm going to bet that he never had a Public Defender come and visit him at the jail.

I know how things work, Ms. Speith, Ms. Ransom, we all know how things work in State Court. They worked even differently back then. Nobody cared about litigation. Nobody cared about, you know, trying to determine what we can do to help somebody with some mental deficiencies.

And so the way things happen in Allen Superior Court is, you know, you get assigned a Public Defender, you sit at jail. The Public Defender, you know, might review your discovery with you, might not. And then you come to court and then you meet with the Public Defender. They sit them in the jury box and you meet with your Public Defender in the jury box. And the Public Defender says, "I have a plea agreement for you." The plea agreement is, you know, you get a suspended sentence

where I'm going to put you on probation. Jesse says, "Does that get me out of jail?" It does. Fine. I'm going to take that plea agreement.

And then he gets pushed off to probation. And, again, you with good probation officers and bad probation officers in every system, but in the state system, it's not -- they just don't have the same, I don't know -- I don't want to say they don't care, I'm certain they care. You know, their case loads are bigger and, again, people are coming in, they're meeting with their probation officer, they're paying their probation user fees, they're not paying their probation user fees, because now they have fees that are piling up, which causes more stress and you have to go out and get a job. And throughout all of that, nothing is being addressed for Jesse. And Jesse needs to have his mental issues addressed.

If he's autistic, we're not going to cure autism, right? We're not going to fix him and he is not going to become a smarter person than he is now. He is not a very smart person. And I don't --

**THE COURT:** But he knows -- clearly he knows right from wrong. I mean, he's --

**ATTORNEY MICHELLE KRAUS:** I'm not saying he doesn't know that, but it takes him longer to understand the consequences. Now --

**THE COURT:** And I appreciate that, but it's been 30

years.

**ATTORNEY MICHELLE KRAUS:** And nobody's ever done it. Nobody has ever done anything. You know, his brother saying he's on the spectrum is the first that probably anybody has articulated that we have a man, a boy who grew up autistic, whose mother was a single mother, they struggled financially.

You know, everybody says he had this great childhood. At 12 he's getting in trouble and he doesn't have the guidance and support -- not because she doesn't care. I'm sure she cared. I'm sure she did the best that she could. But if you have somebody who is struggling and has to go to work and you have a son who is probably clearly autistic, but again, 30 years ago, you know, he was just retarded, right? That's what we said. We said people were retarded and we can't help retarded people.

Now, we are more sympathetic and we are more understanding about these intellectual disabilities and so Jesse could have benefited, his life could have been significantly different if somebody had intervened back then.

And so now here we are in federal court. He has a long history of violence. There's no question he has a long -- and I think part of that is his intellectual disability, is that because he has to think quickly to respond to something and his brain doesn't function the way our brains function and the ability that -- you know, the long term what's going to

happen, even his pastor said, you know, he's gullible, but in a good way. He tries to help people, but he doesn't think through, well, if somebody wants me to go walk into that store and take that pack of gum, I'm going to help them, but then I'm stealing when I'm doing that at the same time. I think that, just, you know, an example, but I think that that is where all of this anger comes from Jesse is that he doesn't know how to manage when things get frustrating for him, he reacts to that, and explodes because he doesn't know what else to do.

And if you look at who he's battering, it's people he loves: It's his family members, it's his wife, it's his girlfriend, it's his mother, it's his brother. It's people who he loves that he --

**THE COURT:** But in this instance, he was threatening, I guess, his best friend? I mean that's what his wife said, it was his best friend. I don't know who this guy is.

**ATTORNEY MICHELLE KRAUS:** Right. Right. Yeah. And so -- which is almost sort of, we talked about, this cultural thing. I don't think there's any question that we can agree somebody who has pulled a gun on Jesse, Jesse left and came back, very aggravating, no question. Very aggravating. But that again, goes to he's not thinking through the consequences of what he's doing. He's thinking through I have to protect, and so -- and I'm not asking you to find --

**THE COURT:** No, I'm processing. I'm listening.

**ATTORNEY MICHELLE KRAUS:** But --

**THE COURT:** But he made a conscious decision to go back and get the gun. There's decision making going on here.

**ATTORNEY MICHELLE KRAUS:** And he has an intellectual disability. So while it makes perfect crystal clear sense for you and I and everybody else in this courtroom that you don't do that, it didn't make sense to him.

He even said -- when, you know, Bob went up and met with him yesterday or the day before to go through the supervised release conditions. And, again, even on the phone calls where he said, oh, I can have a gun. He thinks he can have a gun.

And so Bob was going through the supervised release conditions with him, and he's like, "You understand you can't have a gun? Under any circumstances, you can never have a gun?" Jesse says, "Yes, I understand that." "You can't have ammunition." "Yes, I understand that." "So you're never going to put a gun in your hand, right?" "Yes."

And then he goes, "Well, but what if I want to go hunting?" And Bob is like, "No." And it was not, you know, he's not being silly, he's not being a smart ass. He, you know, all of a sudden, he's like, "Well, if I go out in the woods and I have a gun, can I have a gun?" "No, you can't have a gun."

Bob talked to him about the restrictions of, you know, you

can't leave the Northern District of Indiana. And so he's trying to explain to him what those boundaries are. Jesse: "So I can go to Huntington to see a friend?" "Yes, you can go to Huntington." "So can I go to Indianapolis and see a friend?" "No." "Well, why can't I go to Indianapolis if I can go to Huntington?" "Well, because that's a different district than we're in."

He's really simple. I mean, we really have to break things down to make him understand. That is not, you know, a mental --

**THE COURT:** I appreciate that. But clearly he knows he can't pull a gun on somebody.

**ATTORNEY MICHELLE KRAUS:** And so he's going to go to prison for it. There's no question about that.

**THE COURT:** Yeah.

**ATTORNEY MICHELLE KRAUS:** Yeah, he's going to go to prison because he had possession of a gun, he brought it and he was, you know, angry and frustrated. You know, his wife said he would never hurt anybody. Thank God he didn't, of course.

But I'm asking you to think -- you know, if he goes to prison for 30 months, you know, I don't know if he's ever been in -- have you ever been in the Department of Corrections?

**THE DEFENDANT:** State prison?

**ATTORNEY MICHELLE KRAUS:** Yeah. What is the longest

time you were in state prison?

**THE DEFENDANT:** Two and a half years, the longest.

**ATTORNEY MICHELLE KRAUS:** And so, again, I just feel like all along, the system has failed Jesse. Not -- you know, he was given opportunities. But if nobody is focusing on the right think -- certainly he needs to stop drinking. Obviously, alcohol is a problem. Alcohol is going to create more anxiety and frustration in him and probably, you know, attributes to the anger, so we have to address that.

But if we have an intellectual disability as well, then therapy is what is going to work best in that situation and, you know, this Probation Department and the resources that they have and the more hand holding that they can do once he gets out of prison, the better off Jesse is going to be.

Somebody for the first time is really going to care to make sure that Jesse, you know, he's going to his counseling -- I mean, these people make sure he's getting the counseling.

But they're going to hand hold, which is what Jesse needs. He needs his hand held, because he otherwise just doesn't understand everything that's being said to him.

So I would ask that you would find -- and there are aggravating circumstances, his criminal history, lots of batteries, no question. He left and came back with a gun. No question that that is aggravating.

But I believe, you know, obviously it's very quick acceptance of responsibility. The way that his family describes him as a caring person, family oriented. And then I think that there's -- you know, there's information sort of buried in what we're looking at that, in addition to receiving Social Security disability, that supports that there's this intellectual disability that needs to be addressed.

You know, the only other thing I would point out is that so Jesse was released from prison on July 5th of 2016. He was then arrested for possession of cocaine in 2017. He received a sentence of a year and a half.

And for the first time ever in 2019 he successfully completed that probation. And then he went from 2019 to the OWI in 2024 without having any contact with law enforcement. So, you know, something worked between 2017 -- or he was on probation, because he went a year and a half without any violations and was discharged in 2019 and then stayed out of trouble for about five years.

So, you know, maybe just getting older and becoming more mature is helping him -- of course, then he does this. And, again, you know, for Jesse he didn't think through those consequences of I'm going to leave and come home, I'm going to leave and come home and get back so I can protect my wife. But I would hope that you would see that a 30 year or 30 years -- a 30-month sentence, in light of everything that's

being presented to you, is an appropriate sentence.

He would benefit from a longer period on supervised release. The government, I think, in their sentencing memo requests the three years. I don't disagree with that, because I think more can get accomplished with him with, again, with more of the hand holding that will happen with our Probation Department. And then hopefully he can break the cycle of not knowing how to respond, and then he becomes angry and violent. And he doesn't want to be that way, that's all he knows. That's all he's ever done.

And hopefully, you know -- and we know he's not at the BOP -- he's not going to get any kind of treatment or counseling, get into programming, but, you know, we'll have to wait until he gets out to really start getting the therapy and the help that he needs.

**THE COURT:** Do you want me to make a recommendation that he have a mental health evaluation at least?

**ATTORNEY MICHELLE KRAUS:** Absolutely, yeah. And his preference is to go to Milan.

**ATTORNEY STACEY SPEITH:** Can I just say briefly in rebuttal. According to probation, he was doing individual counseling at Bowen Center before this incident occurred. So he was getting some mental health treatment. It kind of sounded like he wasn't getting treatment for that. But he was getting treatment. And I know you saw that, but I just wanted

to make sure of that.

**THE COURT:** Yeah. I appreciate that. Ms. Kraus and Mr. Graves, if you please approach the podium.

(Doing as requested.)

**THE COURT:** Mr. Graves, this is your opportunity to address the Court and any of the individuals that have come to support you today. Do you wish to make a statement?

**THE DEFENDANT:** Yes, Your Honor.

**THE COURT:** Please go ahead.

**ATTORNEY MICHELLE KRAUS:** Why don't you stand under this microphone so --

**THE COURT:** Please go ahead.

**THE DEFENDANT:** To my family, I'm sorry and I apologize what I put my kids through, baby Justina (phonetic) and Jaleaseona. And that I got a problem, and going away for a while. But I'll be home soon.

And I love you all and 12 brothers been there supporting me, I love you. After this go around done, I'm done with the bull crap; getting older not younger. So I love you all.

To the Court, I apologize for wasting you all time. And I'm, sorry for what I did, but I got to live my life and the consequences and get on with my life when I get out.

That's all I got to say, Your Honor.

**THE COURT:** Thank you, Mr. Graves. I will now state the sentence. In determining a particular sentence to be

imposed, the Court must consider the nature and circumstances of the offense, and the history and characteristics of the defendant, and the Court must impose a sentence that is sufficient, but not greater than necessary, to comply with the purposes of sentencing set forth in 18 U.S.C. Section 3553(a).

First, in mitigation, the Court has considered the defendant's extraordinarily prompt acceptance of responsibility, having pled guilty shortly after his initial appearance. The Court has considered the defendant's learning disability and his difficulties in that regard. The Court has also considered the defendant's relationship with his family and his church.

In aggravation, the Court considered the defendant's extensive criminal history. As we've heard, while the defendant is a criminal history category three, his criminal history category, or his criminal history, rather, is significant.

The defendant has four juvenile convictions, which of course, did not receive points, but two of them involved battery.

The defendant has 14 adult convictions that did not receive points, five of the 14 involved a battery and four of the 14 were alcohol-related.

One of the three convictions that actually received points in this case did also involve a battery.

The Court also finds that the offense conduct in this instance was aggravating. The defendant was intoxicated, left an altercation and returned with a loaded firearm to threaten the individual. This offense conduct, as I've addressed, is distinguishable from mere possession.

After a careful review of the Presentence Investigation Report, and in consideration of all of the evidence, and the parties' arguments, in consideration of the nature and circumstances of the offense, the history and characteristics of the defendant, the defendant's prompt acceptance of responsibility, the defendant's extensive criminal history, the sentencing memoranda provided by the Court (sic), the evidence provided by the government today, the parties' arguments, and the aggravating and mitigating circumstances identified by the Court, the Court concludes that a sentence of 60 months of imprisonment is sufficient, but not greater than necessary to comply with the purposes of sentencing.

In reaching its decision regarding the sentence to impose, the Court notes the sentence imposed is outside the guideline range, but finds that it departs for justifiable reasons.

The Court finds that the sentence, nonetheless, reflects respect for the law, promotes just punishment for the offense, and most importantly, affords adequate deterrence to criminal conduct and protects the public from further crimes by the defendant.

The Court also notes this is the sentence the Court would have imposed, even if it had ruled differently on the defendant's objection. The sentence imposed ultimately reflects the defendant's individual criminal history, and the unique offense conduct in this case.

Accordingly, it would be the judgment of the Court that the defendant, Jesse Graves, be hereby committed to the custody of the Bureau of Prisons, for a term of 60 months of imprisonment on Counts One and Two of the Indictment to be served concurrent with one another.

The defendant shall be placed on three years of supervised release, representing three years on Count One, and three years on Count Two, to be served concurrent to one another.

While the defendant is on supervised release, the defendant shall comply with the 21 conditions set forth in the Court's notice of proposed conditions of supervised release. Those conditions, as well as the supporting conditions or as well as the specific reasons supporting each of the conditions contained in the Court's notice are incorporated by reference into the sentence.

The Court finds the defendant does not have the ability to pay a fine and waives the imposition of a fine in this case.

The Court orders the defendant to pay a special assessment of $200 to the United States, which shall be due immediately.

The Court will may a recommendation to the Bureau of

Prisons that it designate Mr. graves to the Milan, Michigan facility to allow friends and family to visit him.

The Court will recommend consideration for enrollment in the Residential Drug Abuse Program, if Mr. Graves otherwise qualifies for enrollment, or another available program to provide the defendant with -- or to address the defendant's addiction issues.

The Court will recommend that the defendant receive a mental health evaluation and mental health counseling while at the BOP.

Finally, the Court will recommend Mr. Graves for enrollment in any evidence-based recidivism programs or other programs implemented by the BOP to allow the defendant to earn early release credits under the First Step Act.

Ms. Speith, do you know of any reason why the sentence should not be imposed as stated?

**ATTORNEY STACEY SPEITH:** No, Your Honor.

**THE COURT:** And Ms. Kraus, do you know of any reason why the sentence should not be imposed as stated?

**ATTORNEY MICHELLE KRAUS:** No, ma'am.

**THE COURT:** Officer Stanley, pardon me, do you know or have any feedback for the Court with respect to the announcement of the sentence?

**PROBATION OFFICER STANLEY:** No, Your Honor.

**THE COURT:** The Court orders the sentence imposed as

stated at this time.

Mr. Graves, you've now heard the judgment of this Court. I'm required to advise you that you can appeal your conviction in this case if you believe that your guilty plea was somehow unlawful or involuntary, or if there is some other fundamental defect in the proceedings. You also have a statutory right to appeal your sentence under certain circumstances, particularly if you think the sentence is contrary to law.

With few exceptions, any notice of appeal must be filed within 14 days of judgment being entered in your case.

If you want to file an appeal, and you are unable to pay the costs of an appeal, you may be able to pursue an appeal at no cost to you. If you so request, the Clerk of the Court will prepare and file a Notice of Appeal on your behalf.

Ms. Kraus, I remind you of your duty to perfect a timely appeal of this sentence. Furthermore, pursuant to Circuit Rule 51, you are responsible for the continued representation of your client on appeal, unless specifically relieved by the Court of Appeals upon a motion to withdraw for good cause.

All requests for appointment of appellate counsel must be taken to the Court of Appeals, as this Court does not have the authority to entertain such requests.

That concludes the proceedings. The defendant is hereby remanded to the custody of the United States Marshals. Good luck.

**THE CLERK:** All rise.

* * *

**CERTIFICATE OF THE REPORTER**

I hereby certify that the foregoing proceedings is true and correct, as taken down and transcribed to the best of my ability, with the aid of realtime computer-aided transcription and/or a transcriptionist.

s/ Tina M. Gallucci
**Tina M. Gallucci, RMR, CRR, FCRR**
**United States District Court Reporter**

*Certificate applies only to Original Transcript hereof,* and does not apply to any copies of this, whether *Xerox or computerized.*

**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF INDIANA**
**FORT WAYNE DIVISION**

| | |
|---|---|
| UNITED STATES OF AMERICA<br>v.<br>JESSE L GRAVES, | CASE NO. 1:24-CR-49-HAB-ALT |

**OPINION AND ORDER**

Defendant, Jesse L. Graves, is awaiting sentence on his convictions for violating two firearm statutes. Following Defendant's guilty plea to both counts of the indictment, the probation office prepared and filed a draft presentence investigation report ("PSR") (ECF No. 32). In that report, Defendant received an enhanced offense level under U.S.S.G. §2K2.1(a)(4) and §4B1.2(a) based on a prior crime of violence stemming from his domestic battery conviction. Defendant objected to this finding arguing that the state domestic battery charge was not a crime of violence.[1] (ECF No. 35). After receiving a response from the Government, the probation officer submitted a final PSR (ECF No. 39) along with an addendum (ECF No. 40) in which it concluded that the draft PSR correctly reflected the Defendant's offense level. The parties requested to submit briefing on the objection, which the Court has now received. (ECF Nos. 44, 45, 46). Because the Court finds that the Defendant's state domestic battery charge was properly determined to be a crime of violence, the Court overrules the Defendant's objection.

**DISCUSSION**

[1] Defendant had additional objections that the Court resolved at a telephone sentencing status conference. (ECF No. 41). The parties requested briefing on the remaining objection.

Case: 26-1292 Filed: 04/29/2026 Pages: 92

The underlying facts of the Defendant's current offense are not relevant to his objection. Suffice it to say, Defendant pleaded guilty to possessing a firearm when he knew he was prohibited from doing so. The only question for the Court's resolution is whether Defendant's prior state conviction for domestic battery constitutes a crime of violence for federal sentencing purposes.

The PSR enhanced Defendant's base offense level from 14 to 20 under U.S.S.G. §2K2.1(a)(4) because the Defendant committed the instant offense subsequent to sustaining one felony conviction for a crime of violence. "Crime of violence" is a nuanced term defined in U.S.S.G. § 4B1.2(a). Under that provision, a crime of violence is any felony offense that "has as an element the use, attempted use, or threatened use of physical force against the person of another." *Id.* The categorical approach is the primary method for considering whether a previous conviction qualifies as a predicate crime of violence. *See Descamps v. United States*, 570 U.S. 254, 257 (2013); *United States v. Curtis*, 645 F.3d 937, 939–40 (7th Cir. 2011). The sentencing court "looks at the elements of the statute of conviction to determine if it has as an element the use, attempted use, or threatened use of physical force against the person of another." *United States v. Yang*, 799 F.3d 750, 752 (7th Cir. 2015) (quotation marks omitted).

The Supreme Court has defined "physical force" in the context of the similarly-worded definition of a "violent felony" under the Armed Career Criminal Act (ACCA), 18 U.S.C. § 924(e)(2)(B). See *Johnson v. United States*, 559 U.S. 133 (2010). In *Johnson*, the Court held that "physical force" means "violent force—that is, force capable of causing physical pain or injury to another person." *Johnson*, 559 U.S. at 140. In *Stokeling v. United States,* 586 U.S. 73, 84 (2019), the Supreme Court clarified that the definition of force settled on in *Johnson* did not mean force "reasonably expected to cause pain or injury." Simply put, *Stokeling* held that *Johnson* "does not require any particular degree of likelihood or probability that the force used will cause physical

pain or injury; only potentiality." *Id.* Thus, if the level of force has the potential of causing pain or injury, it is physical force sufficient to qualify as a crime of violence.

With the definition from *Johnson* in mind, as reaffirmed by *Stokeling*, the next question is whether battery pursuant to Indiana Code § 35-42-2-1.3 can be committed without force that is capable of causing physical pain or injury to another person. This Court has answered that question in the negative at least thrice. *United States v. Bonner*, 1:18-CR-76 (N.D. Ind. June 7, 2019) (Brady, J); *United States v. Sanders,* 2019 WL 6487324 (N.D. Ind. December 3, 2019) (Brady, J.); *United States v, Stinson*, 2019 WL 2754967 (N.D. Ind. July 2, 2019) (Brady, J). In *Bonner*, this Court wrote:

> When all is said, the most decisive fact seems to be that Indiana's battery statute requires that the touching actually result in an impairment of physical condition, i.e., physical pain or injury. Because the victim must suffer physical pain or injury, a battery conviction under the Indiana statute necessarily—and literally—requires that the defendant use a level of force that is "capable of causing physical pain or injury." *Johnson*, 559 U.S. at 140. Thus, *Johnson*, as further clarified by *Stokeling*, appears to require the conclusion that the Defendant's previous domestic battery conviction be considered a crime of violence for purposes of the Guidelines.

*Bonner,* ECF No. 49, at 10-11.

Defendant argues that there are other cases in this district that hold otherwise, citing *United States v. Curry*, 2018 WL 1835907 (N.D. Ind. April 18, 2018) (Springmann, J.) In *Curry*, decided prior to the Supreme Court's decision in *Stokeling*, the Court determined that the statute did not qualify as a crime of violence because the crime can be committed with a level of force that is not "reasonably expected" to cause pain or injury. But, as set out above, that is not the appropriate consideration following *Stokeling*. Accordingly, the Court reaffirms its prior holdings in *Bonner, Sanders,* and *Stinson*, that because Indiana's domestic violence statute includes a requirement that the victim must suffer physical pain or injury, it is a crime of violence for Guidelines purposes.

There is no dispute that Defendant has a felony conviction for domestic battery for violating Indiana Code §34-42-2-1.3.[2] Because the Defendant has an Indiana felony domestic battery conviction and the Court finds that violation of the statute constitutes a crime of violence, the Court OVERRULES the Defendant's objection to the PSR (ECF No. 35).

## CONCLUSION

Based on the above, the Defendant's objection to the PSR (ECF No. 35) is overruled. The Court will issue a sentencing scheduling order by separate entry.

**SO ORDERED** this 7th day of January 2026.

s/Holly A. Brady
CHIEF JUDGE HOLLY A. BRADY
UNITED STATES DISTRICT COURT

[2] With respect to Count 1, the charging Information reads:

> On or about the 25th day of March, 2012, in the County of Allen and in the State of Indiana, said defendant Jesse L. Graves, did knowingly or intentionally touch Niocka Potter, who has a child in common with said defendant, in a rude, insolent or angry manner resulting in bodily injury, to wit: physical pain and/or visible injury, being contrary to the form of the statute in such case made and provided.

**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF INDIANA**

| | |
|---|---|
| **UNITED STATES OF AMERICA**<br>**Plaintiff,**<br>**vs.**<br>**JESSE L GRAVES**<br>**Defendant.** | **CASE NUMBER: 1:24CR49-001**<br>**USM Number: 62314-511**<br><br>**MICHELLE F KRAUS - FCD**<br>**DEFENDANT'S ATTORNEY** |

## JUDGMENT IN A CRIMINAL CASE

**THE DEFENDANT** pled guilty to Counts 1 and 2 of the Indictment on March 27, 2025.

**ACCORDINGLY,** the Court has adjudicated that the Defendant is guilty of the following offense:

| Title, Section & Nature of Offense | Date Offense Ended | Count Number |
|---|---|---|
| 18:922(g)(1): FELON IN POSSESSION OF A FIREARM AND FORFEITURE | November 27, 2024 | 1 |
| 18:922(g)(9): PERSON CONVICTED OF MISDEMEANOR CRIME OF DOMESTIC VIOLENCE IN POSSESSION OF A FIREARM | November 27, 2024 | 2 |

The Defendant is sentenced as provided in pages 2 through 7 of this Judgment. The sentence is imposed pursuant to the Sentencing Reform Act of 1984.

IT IS ORDERED that the Defendant must notify the United States Attorney for this District within 30 days of any change of name, residence, or mailing address until all fines, restitution, costs and special assessments imposed by this Judgment are fully paid. If ordered to pay restitution, the Defendant must notify the Court and United States Attorney of any material change in economic circumstances.

January 29, 2026
Date of Imposition of Judgment

s/ Holly A. Brady
Signature of Judge

Holly A. Brady, Chief Judge, U. S. District Court
Name and Title of Judge

January 29, 2026
Date

## MPRISONMENT

The Defendant is hereby committed to the custody of the United States Bureau of Prisons to be imprisoned for a term of **60 MONTHS** on each of Counts 1 and 2 to run concurrent with one another.

The Court makes the following recommendations to the Bureau of Prisons:

1. That the Defendant serve his term of imprisonment at a federal facility closest to Milan, Michigan to facilitate visitation with family and friends.

2. That the Defendant participate in the Residential Drug Assistance Program (RDAP) or another available program to address his substance abuse issues.

3. That the Defendant undergo a mental health evaluation and participate in a mental health counseling program to address his mental health issues.

4. That the Defendant be considered for enrollment in any Evidence Based Recidivism Reduction Programs or other programs implemented by the BOP to allow the Defendant to earn early release credits under the First Step Act.

5. That the Defendant participate in residential re-entry programs specific to his needs, as available under the First Step Act.

6. That the Defendant be assessed for participation in the Evidence Based Recidivisim Reduction Program (pursuant to the First Step Act) as well as any recidivism programs developed or to be developed under 34 U.S.C. § 605.

The Defendant is remanded to the custody of the United States Marshal.

## RETURN

I have executed this Judgment as follows:

Defendant delivered ____________________ to ______________ at ______________, with a certified copy of this Judgment.

_____________________________
UNITED STATES MARSHAL

By: _____________________________
DEPUTY UNITED STATES MARSHAL

## SUPERVISED RELEASE

Upon release from imprisonment, the Defendant shall be on supervised release for a term of **3 YEARS.**

## CONDITIONS OF SUPERVISED RELEASE

**While the Defendant is on supervised release pursuant to this Judgment, the Defendant shall comply with the following conditions as required by 18 U.S.C. § 3583(d):**

1. The Defendant shall not commit another Federal, State, or local crime, during the period of supervision.

2. The Defendant shall not unlawfully possess a controlled substance.

3. The Defendant shall refrain from any unlawful use of a controlled substance.

4. The Defendant shall submit to a drug test within 15 days of release on supervision.

5. The Defendant shall submit to at least two periodic tests thereafter for use of a controlled substance.

6. The Defendant shall cooperate in the collection of a DNA sample from the Defendant, if the collection of such a sample is authorized pursuant to Section 3 of the DNA Analysis Backlog Elimination Act of 2000 and 34 U.S.C. § 40702.

**The Defendant shall comply with the following discretionary conditions as provided by 18 U.S.C. §§ 3563(b)(1)-(23) and 3583(d):**

7. The Defendant shall not knowingly leave the federal judicial district of the Northern District of Indiana, unless granted permission to leave by the Court or a probation officer. A map of the federal judicial district of the Northern District of Indiana and its 32 counties can be found at the website for United States Probation and Pretrial Services (http://www.innp.uscourts.gov/files/inncountymapjpg).

8. The Defendant shall report to the probation officer as reasonably directed by the Court or the probation officer, which includes the requirement that the Defendant report in person to the probation office in the district to which the Defendant is released for supervision within 72 hours of release from the custody of the Bureau of Prisons.

9. The Defendant shall answer inquiries by a probation officer pertaining to the Defendant's supervision and notify the probation officer within 72 hours of any change of residence or change of employer. This condition does not prevent the Defendant from invoking his Fifth Amendment privilege against self-incrimination.

10. The Defendant shall notify the probation officer within 72 hours of being arrested or questioned by a police officer.

11. The Defendant shall permit a probation officer to visit him at his home between the hours of 8:00 AM to 8:00 PM. A probation officer can make an oral or written request to the Court to allow for a reasonable alternative time period or place for the visit. The

Defendant shall permit confiscation of any contraband observed in plain view by the probation officer.

12. The Defendant shall make reasonable effort to maintain employment at a lawful occupation, unless excused by the probation officer for acceptable reasons (e.g., schooling, training, child care, elder care, disability, age, or serious health condition) or shall pursue a course of study or vocational training that will equip the Defendant for employment at a lawful occupation.

13. The Defendant shall perform 20 hours per week of community service, not to exceed 400 hours, if the Defendant is unemployed for a time period exceeding 60 days within the first year of supervised release.

14. The Defendant shall refrain from use of alcohol that results in the violation of any local, state, or federal laws, including disorderly intoxication and/or driving under the influence, or any use of a narcotic drug or other controlled substance, as defined in section 102 of the Controlled Substances Act (21 U.S.C. § 802), without a prescription by a licensed medical practitioner..

15. The Defendant shall not knowingly possess a firearm, ammunition, destructive device, or any other dangerous weapon.

16. Within the first year of supervision, the Defendant shall participate in a High School Equivalency (HSE) Preparation Course if not obtained while in the Bureau of Prisons..

**The Defendant shall comply with the following discretionary conditions as provided by U.S.S.G. § 5D1.3:**

17. The Defendant shall not enter into any agreement to act as an informer or a special agent of a law enforcement agency, without the permission of the Court.

18. The Defendant shall participate in a program approved by the United States Probation Office for substance abuse, which may include testing for the detection of alcohol, controlled substances, or illegal mood-altering substance, if necessary, after evaluation at the time of release.

19. The Defendant shall participate in a mental health program approved by the United States Probation Office, if necessary, after evaluation at the time of release.

20. The Defendant shall pay all or part of the costs for participation in the above programs not to exceed the sliding fee scale as established by the Department of Health and Human Services and adopted by this Court, as the U.S. Probation Office determines that the Defendant is financially capable of paying. Failure to pay due to financial inability shall not be grounds for revocation.

21. If a fine is imposed and has not been paid upon release to supervised release, the Defendant shall adhere to an installment schedule to pay that fine.

## DIRECTIVE TO PROBATION

Within 72 hours of Defendant's release from prison, the probation officer is to meet with and remind the Defendant of the conditions of his supervision and also to consider whether to recommend to the Court any modifications of or additions to those conditions in light of any changes in the Defendant's circumstances since the sentencing hearing. Consistent with *United States v. Siegel* (7th Cir. May 29, 2014), the Court also directs the Probation Office to notify the Court within 30 days of Defendant's placement on supervision so that it may consider any appropriate modifications to the Defendant's supervised release and schedule a hearing on that topic, if necessary. The Defendant may also request a modification of these conditions at any time by filing a written motion with the Court.

## CRIMINAL MONETARY PENALTIES

The Court finds that the Defendant does not have the ability to pay a fine and waives the imposition of a fine in this case due to the Defendant's inability to pay.

The Court **ORDERS** the Defendant to pay the special assessment of $200.00 to the U.S. District Court Clerk's Office, 1108 E. Ross Adair Courthouse, 1300 South Harrison Street, Fort Wayne, IN 46802, which shall be due immediately.

| **Total Assessment** | **Total Fine** | **Total Restitution** |
|---|---|---|
| $200.00 | NONE | NONE |

The Defendant shall receive credit for all payments previously made toward any criminal monetary payments imposed.

## ACKNOWLEDGMENT OF SUPERVISION CONDITIONS

Upon a finding of a violation of probation or supervised release, I understand that the Court may (1) revoke supervision, (2) extend the term of supervision, and/or (3) modify the conditions of supervision.

I have reviewed the Judgment and Commitment Order in my case and the supervision conditions therein. These conditions have been read to me. I fully understand the conditions and have been provided a copy of them.

(Signed)

______________________________ _______________
Defendant Date

______________________________ _______________
U.S. Probation Officer/Designated Witness Date